**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 16-11**

MARCUS REYMOND ROBINSON,

Petitioner - Appellant,

v.

EDWARD THOMAS, Warden of Central Prison, Raleigh, North Carolina,

Respondent - Appellee.

**No. 16-12**

TILMON C. GOLPHIN,

Petitioner - Appellant,

v.

EDWARD THOMAS, Warden of Central Prison, Raleigh, North Carolina,

Respondent - Appellee.

Appeals from the United States District Court for the Eastern District of North Carolina, at Raleigh.  James C. Dever III, Chief District Judge; Terrence W. Boyle, District Judge. (5:16-hc-02028-D; 5:16-hc-02029-BO)

Argued:  January 25, 2017                    Decided:  April 27, 2017

Before KING, AGEE, and FLOYD, Circuit Judges.

---

Affirmed by published opinion. Judge Agee wrote the opinion, in which Judge King and Judge Floyd joined.

---

**ARGUED:** David Weiss, CENTER FOR DEATH PENALTY LITIGATION, Durham, North Carolina, for Appellants. Danielle Marquis Elder, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellee. **ON BRIEF:** Donald H. Beskind, DUKE UNIVERSITY SCHOOL OF LAW, Durham, North Carolina, for Appellant Marcus Reymond Robinson. Kenneth J. Rose, CENTER FOR DEATH PENALTY LITIGATION, Durham, North Carolina; Jay H. Ferguson, THOMAS, FERGUSON & MULLINS, LLP, Durham, North Carolina, for Appellant Tilmon C. Golphin. Roy Cooper, Attorney General of North Carolina, Jonathan P. Babb, Special Deputy Attorney General, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellee.

---

AGEE, Circuit Judge:

After being sentenced to death upon first-degree murder convictions, Marcus Robinson and Tilmon Golphin (collectively, "Petitioners") sought post-conviction relief in state court pursuant to North Carolina's Racial Justice Act ("RJA"), N.C. Gen. Stat. §§ 15A-2010 to 2012 (2009) (repealed 2013). Following separate evidentiary hearings, the North Carolina trial court awarded relief under the RJA, reducing their death sentences to life imprisonment. The State of North Carolina ("the State") appealed, and the North Carolina Supreme Court vacated and remanded their cases to the state trial court for additional RJA proceedings. Petitioners then brought separate actions in federal district court pursuant to 28 U.S.C. § 2241, each maintaining that a second RJA proceeding would violate their rights under the Double Jeopardy Clause of the Fifth Amendment. The district court abstained from exercising federal jurisdiction pursuant to *Younger v. Harris*, 401 U.S. 37 (1971), under the precept that a federal court "should not act to restrain a [state] criminal prosecution, when the moving party has an adequate remedy at law and will not suffer irreparable injury if denied equitable relief." *Id.* at 43–44. As an alternate basis for its judgment, the district court held that Petitioners had also failed to exhaust their state remedies. For the reasons that follow, we affirm the district court's decision to abstain from intervening in Petitioners' ongoing state court proceedings under *Younger*.

3

I.

A.

Enacted in August 2009, the RJA redefined eligibility for the death penalty in North Carolina, providing that no person whose judgment was sought or obtained on the basis of race could be sentenced to death, and establishing a procedure for previously sentenced capital defendants to challenge their death sentences. N.C. Gen. Stat. § 15A-2010 (2009). For such post-conviction challenges, the RJA authorized state trial courts to hold evidentiary hearings and to make factual findings as to whether race was a significant factor in leading to a death sentence. *Id.* § 15A-2012(a). For defendants who established entitlement to post-conviction relief under the RJA, the statute mandated "that the death sentence imposed by the judgment shall be vacated and the defendant resentenced to life imprisonment without the possibility of parole." *Id.* § 15A-2012(a)(3).

On July 2, 2012, the North Carolina General Assembly enacted amendments to the RJA, but preserved its retroactive application to all death row inmates, as well as the provision that a successful claim would result in vacatur of the death sentence and imposition of a sentence of life imprisonment with no mechanism for appeal of that sentence. *See* 2012 N.C. Sess. Laws 471, § 3(g).

The next year, the North Carolina General Assembly repealed the RJA effective June 19, 2013. *See* 2013 N.C. Sess. Laws 368, § 5(a). The repeal statute provided that it applied to all pending RJA motions filed prior to the effective date of the repeal, and that all such motions were void. *Id.* § 5(d). In addition, the repeal statute also provided that it

4

applied to litigants who obtained relief under the RJA, but whose relief could be vacated on appeal:

> This section does not apply to a court order resentencing a petitioner to life imprisonment without parole pursuant to the provisions of Article 101 of Chapter 15A of the General Statutes prior to the effective date of this act if the order is affirmed upon appellate review and becomes a final Order issued by a court of competent jurisdiction. *This section is applicable in any case where a court resentenced a petitioner to life imprisonment without parole* pursuant to the provisions of Article 101 of Chapter 15A of the General Statutes prior to the effective date of this act, *and the Order is vacated upon appellate review by a court of competent jurisdiction.*

*Id.* (emphasis added).

## B.

The state court proceedings for each petitioner are ongoing and present a complex web of procedural history. We include such detail here as necessary to lend context to our decision.

## 1.

In 1994, Robinson was convicted after a jury trial of first-degree murder for the killing of Erik Tornblom, a 17-year-old rising senior in high school. Robinson and an accomplice shot Tornblom in the face with a shotgun and then stole his car and $27. The jury found two aggravating circumstances existed that were sufficient to impose the death penalty and recommended the death sentence. The trial court imposed that sentence on August 4, 1994. Robinson appealed both his conviction and sentence, but those appeals were unsuccessful. *See generally State v. Robinson*, 463 S.E.2d 218 (N.C. 1995).

Robinson's requests for state, *see generally State v. Robinson*, 539 S.E.2d 646 (N.C. 1999) (denying certiorari review of state trial court's denial of post-conviction motion for

5

appropriate relief), and federal, *see generally Robinson v. Polk*, 438 F.3d 350 (4th Cir. 2006) (affirming the district court's denial of a petition for the writ of habeas corpus), post-conviction relief also failed.

In 2010, Robinson sought post-conviction relief under the RJA in the state trial court. Robinson's motion alleged that race was a factor in the prosecutor's decision to seek the death penalty and the exercise of peremptory strikes, as well as the jury's decision to impose the death penalty. After a two-week evidentiary hearing, the state trial court found that racial disparities impacted Robinson's death sentence and determined that the RJA standards were satisfied so that Robinson was ineligible for the death penalty and entitled to a sentence of life imprisonment. The state trial court entered a judgment vacating the death sentence and resentencing Robinson to life imprisonment without parole.

2.

Golphin's case history tracks a similar course. He was convicted of two counts of first-degree murder for killing North Carolina State Highway Patrol Trooper Lloyd E. Lowry and Cumberland County Deputy Sherriff David Hathcock and sentenced to death for each murder. *See generally State v. Golphin*, 533 S.E.2d 168 (N.C. 2000). The conviction and sentences were affirmed on direct appeal. *Id.*

Golphin unsuccessfully pursued state, *see generally State v. Golphin*, 593 S.E.2d 84 (N.C. 2004) (denying certiorari review of the denial of a state post-conviction motion for appropriate relief), and federal, *see generally Golphin v. Branker*, 519 F.3d 168 (4th Cir. 2008) (affirming the district court's denial of a petition for the writ of habeas corpus), post-conviction review.

6

In 2010, Golphin also filed a state motion for post-conviction relief pursuant to the RJA. Similar to Robinson, Golphin alleged race was a significant factor in the decisions to seek and impose the death penalty. The state trial court held an evidentiary hearing and concluded that statistical disparities and intentional discrimination affected Golphin's trial and capital sentencing. That court then vacated Golphin's death sentence based upon both the original RJA and amended 2012 version and re-sentenced Golphin to life imprisonment without parole.

C.

The State petitioned the North Carolina Supreme Court for review of the orders granting relief under the RJA for Robinson and Golphin in separate appeals, which Petitioners opposed. In his preliminary response brief to the State's request for a grant of certiorari, Robinson failed to raise any double jeopardy argument. Golphin, however, asserted further proceedings in the state trial court would violate his rights under the Double Jeopardy Clause in his preliminary brief opposing certiorari.

The North Carolina Supreme Court granted the State's petitions, and briefing on the merits ensued. Both Petitioners proffered Double Jeopardy Clause arguments in their merits briefing.

In December 2015, the North Carolina Supreme Court vacated the trial court's RJA orders in both cases and remanded for further proceedings, but did not explicitly address Petitioners' double jeopardy arguments. *State v. Augustine*, 780 S.E.2d 552 (N.C. 2015) (mem.); *State v. Robinson*, 780 S.E.2d 151, 151–52 (N.C. 2015). Both Robinson and Golphin filed motions for clarification of the Supreme Court's decision, reasserting their

7

double jeopardy arguments, but those motions were denied without explanation. *State v. Robinson*, 782 S.E.2d 324 (N.C. 2016) (mem.); *State v. Augustine*, 782 S.E.2d 323 (N.C. 2016) (mem.).

The mandates of the North Carolina Supreme Court for further RJA proceedings issued to the trial court in January 2016.[1]

D.

In February 2016, Robinson and Golphin separately petitioned for writs of habeas corpus under 28 U.S.C. § 2241 in the United States District Court for the Eastern District of North Carolina, seeking relief from a second RJA proceeding based on the Double Jeopardy Clause. They also moved the district court to stay further proceedings in state court.

The district court denied Petitioners' requests to enjoin further state court proceedings and dismissed the petitions without prejudice. In separate opinions that mirror one another, the district courts abstained from exercising federal jurisdiction pursuant to *Younger v. Harris*, 401 U.S. 37 (1971), and, alternatively, held that Petitioners had failed to exhaust their double jeopardy claims in state court. *Golphin v. Joyner*, No. 5:16-HC-

---

[1] During the pendency of the State's appeal, in June 2013, the North Carolina General Assembly repealed the RJA. *See* 2013 N.C. Sess. Laws 368, § 5(a).

In May 2016, Petitioners and two other RJA defendants filed a petition for a writ of certiorari in the Supreme Court of the United States seeking review of the North Carolina Supreme Court's decisions. The petition did address Robinson and Golphin's double jeopardy contentions. *See Robinson v. North Carolina*, No. 15-1397. Their certiorari petition was denied by the Supreme Court of the United States on October 3, 2016. *Robinson v. North Carolina*, 137 S. Ct. 67 (2016) (mem.).

2029-BO, slip op., at *8–11 (E.D.N.C. June 6, 2016); *Robinson v. Joyner*, No. 5:16-HC-2028-D, slip op., at *8–11 (E.D.N.C. June 4, 2016).

Petitioners timely filed separate notices of appeal, and we consolidated their cases for purposes of this appeal. As noted, at the time their federal appeals were filed, Petitioners' RJA motions were pending on remand in the state trial court. Since we held oral argument on January 25, 2017, the state trial court ruled on Petitioners' pending RJA-based motions. That court concluded on North Carolina statutory grounds that the RJA repeal bill applies to Petitioners and, although they raised double jeopardy objections, the state court did not address those arguments. As a result, Petitioners' state court proceedings are ongoing through the appeals process in North Carolina.[2] We have jurisdiction to entertain this appeal from the district court's dismissal order under 28 U.S.C. §§ 1291, 2253.

## II.

State prisoners, like Golphin and Robinson, must exhaust their state remedies before filing a habeas petition in federal court. *Timms v. Johns*, 627 F.3d 525, 530–31 (4th Cir. 2010) ("As a general rule, in the absence of exceptional circumstances where the need for the remedy afforded by the writ of habeas corpus is apparent, courts require exhaustion of alternative remedies before a prisoner can seek federal habeas relief." (internal alterations,

---

[2] Petitioners sought and have been granted an extension of time to petition for writs of certiorari in the North Carolina Supreme Court to appeal the recent decision of the state trial court.

9

citations, and quotation marks omitted)). The purpose of the exhaustion requirement is to "giv[e] the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Jones v. Sussex I State Prison*, 591 F.3d 707, 712 (4th Cir. 2010). The State contends Petitioners did not exhaust their state remedies before filing their petitions in federal court.

A habeas petitioner satisfies the exhaustion requirement by "'fairly present[ing]' his claim in each appropriate state court . . . thereby alerting that court to the federal nature of the claim." *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (quoting *Duncan v. Henry*, 513 U.S. 364, 365–66 (1995)). A petitioner must show that "both the operative facts and the controlling legal principles [were] presented to the state court." *Jones*, 591 F.3d at 713 (quoting *Baker v. Corcoran*, 220 F.3d 276, 289 (4th Cir. 2000)). That burden has been met by Petitioners in this case.

Petitioners filed separate RJA motions in state court. Upon the favorable ruling by the state trial court in both cases, the State sought certiorari review in the North Carolina Supreme Court. Golphin raised a double jeopardy argument in his brief opposing certiorari and again in his merits brief.[3] Unlike Golphin, Robinson did not raise the double jeopardy claim in response to the state certiorari petition, but he did raise it in his brief on the merits. North Carolina does not require a party to raise arguments in response to a petition for a

---

[3] The district court in Golphin's case found the double jeopardy claim unexhausted because it believed Golphin did not raise the claim in response to the state's petition for writ of certiorari. *Golphin*, No. 5:16-HC-2029-BO, slip op. at *11–12. That factual determination was clearly erroneous, as Golphin did, in fact, raise double jeopardy objections in his brief opposing certiorari.

10

writ of certiorari in order to preserve those arguments for merits briefing should certiorari be granted. *See* N.C. R. App. P. 21. Both Petitioners' pleadings were thus adequate to exhaust available state court remedies before seeking habeas relief in federal court, and the State points to no authority to the contrary. *See Jenkins v. Fitzberger*, 440 F.2d 1188, 1189 (4th Cir. 1971) ("[T]he exhaustion requirement of 28 U.S.C. § 2254 is not a jurisdictional concept but simply a flexible matter of comity[.]" (internal quotation marks omitted)).[4]

The State nonetheless urges that Petitioners' double jeopardy claims are not exhausted because they "did not become ripe until after the Supreme Court of North Carolina entered its [remand] order[.]" Response Br. 20. Not so. The double jeopardy argument became ripe upon the State's appeal of the trial court's grant of Petitioners' RJA motions. *See Smalis v. Pennsylvania*, 476 U.S. 140, 142 (1986) ("[W]hen a trial court enters such a judgment [of acquittal], the Double Jeopardy Clause bars an appeal by the prosecution[.]"); *see also* N.C. Gen. Stat. § 15A-1445(a) (permitting adjudication of a double jeopardy claim as a threshold matter on appeal).

---

[4] The State itself recognized and addressed the double jeopardy issue in its opposing brief before the North Carolina Supreme Court, which further evidences Petitioners' fair presentment of their claims. *See Smith v. Digmon*, 434 U.S. 332, 333 (1978) (per curiam) (finding that the State of Alabama's opposition in its brief to petitioner's constitutional claim in state court supported conclusion that petitioner had fairly presented that claim); *Jones*, 591 F.3d at 714 (observing the Commonwealth's addressing double jeopardy issue in its brief before the Virginia Supreme Court demonstrated fair presentment of that claim). That the North Carolina Supreme Court declined to address Petitioners' double jeopardy claims does not alter the fair presentation of those claims. All that is required for purposes of exhaustion is that Petitioners "must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). Petitioners did so here.

For these reasons, the State's argument that Petitioners failed to exhaust their state remedies before seeking habeas relief in federal court lacks merit. [5]

## III.

## A.

The principal issue on appeal is whether the district court appropriately abstained under *Younger v. Harris*, 401 U.S. 37 (1971), from exercising jurisdiction, thus declining to reach Petitioners' claims under the Double Jeopardy Clause. We review for abuse of discretion a district court's decision to abstain. *Nivens v. Gilchrist* (*Nivens I*), 319 F.3d 151, 152 (4th Cir. 2003).

---

[5] Without pointing to any deficiency in the petitions, the State also posits that Petitioners should have filed their federal habeas petitions under 28 U.S.C. § 2254 instead of § 2241. We need not resolve this issue as the district court properly abstained from exercising jurisdiction over the claims under *Younger v. Harris*, 401 U.S. 37 (1971). Section 2254 applies to most post-conviction proceedings that are brought by petitioners who are "in custody pursuant to the judgment of a State court." 28 U.S.C. § 2254(a); *In re Wright*, 826 F.3d 774, 783 (4th Cir. 2016) ("[W]hen a prisoner being held pursuant to the judgment of a State court files a habeas petition claiming the execution of his sentence is in violation of the Constitution, laws, or treaties of the United States, the more specific § 2254 and all associated statutory requirements shall apply, regardless of the statutory label the prisoner chooses to give his petition." (internal quotation marks omitted)). However, a petition under § 2241 may be the appropriate vehicle for Petitioners' claims here because, at the time the petitions were filed, Petitioners likely faced an indeterminate sentence as a result of ongoing state RJA proceedings and, therefore, were not in custody pursuant to a state court judgment. *See Berman v. United States*, 302 U.S. 211, 212 (1937) ("Final judgment in a criminal case means sentence. The sentence is the judgment."); *Harrison v. Gillespie*, 640 F.3d 888, 896 (9th Cir. 2011) ("In effect, Harrison is currently in custody under an indeterminate sentence for his first-degree murder conviction, and he is attacking the possibility of receiving a death sentence in the future. We therefore have jurisdiction under 28 U.S.C. § 2241.").

The Supreme Court in *Younger* articulated the "national policy forbidding federal courts to stay or enjoin pending state court proceedings except under special circumstances." 401 U.S. at 41; *accord Kugler v. Helfant*, 421 U.S. 117, 123 (1975) ("[I]n the absence of exceptional circumstances creating a threat of irreparable injury both great and immediate, a federal court must not intervene by way of either injunction or declaratory judgment in a pending state criminal prosecution." (internal quotation marks omitted)). The *Younger* doctrine rests on the fundamental precepts of equity and comity. "[C]ourts of equity should not act, and particularly should not act to restrain a criminal prosecution, when the moving party has an adequate remedy at law and will not suffer irreparable injury if denied equitable relief." *Younger*, 401 U.S. at 43–44. The comity notion relates to "a proper respect for state functions, a recognition of the fact that the entire country is made up of a Union of separate state governments, and a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways." *Id.* at 44.

The Supreme Court explained in *Middlesex City Ethics Committee v. Garden State Bar Ass'n*, 457 U.S. 423 (1982), that even if a federal court could exercise jurisdiction, it should refrain from doing so if (1) there is an ongoing state judicial proceeding that began prior to substantial progress in the federal proceeding, (2) that proceeding implicates important, substantial, or vital state interests, and (3) there is an adequate opportunity to raise constitutional challenges within the framework of the state judicial process. *Id.* at 432; *Nivens I*, 319 F.3d at 153.

13

All of the factors articulated in *Middlesex* are present in this case. As to the first *Middlesex* factor, Petitioners brought their petitions in federal court in an attempt to stop ongoing state proceedings with respect to their RJA motions. In relation to the second factor, construction of the RJA and subsequent repeal statute, which may apply to Petitioners, lies at the heart of this case. Undoubtedly, North Carolina has an important, substantial, and vital interest in interpreting its criminal laws, and that interest is strengthened here where those laws present a complex web of legislative amendments and history. *See Younger*, 401 U.S. at 43–44. Third, there are ongoing state proceedings in which Petitioners have an adequate opportunity to present their argument that a second RJA hearing would violate their double jeopardy rights. Although they argue the state courts are not their preferred venue, *"*[m]inimal respect for the state processes, of course, precludes any presumption that the state courts will not safeguard federal constitutional rights." *Middlesex*, 457 U.S. at 431. Because the basic requirements for *Younger* abstention are present in this case, the district court did not abuse its discretion in abstaining unless Petitioners' claims fall within an exception to the "fundamental policy" that federal courts should abstain from interfering in state criminal proceedings. *Younger*, 401 U.S. at 45–46.

B.

A federal court may disregard *Younger*'s mandate to abstain from interfering with ongoing state proceedings only where "extraordinary circumstances" exist that present the possibility of irreparable harm. *Kugler*, 421 U.S. at 124; *Nivens v. Gilchrist* (*Nivens II*),

14

444 F.3d 237, 241 (4th Cir. 2006).  The Supreme Court in *Younger* explained this limited

deviation from the "fundamental policy" of federal abstention:

> [W]hen absolutely necessary for protection of constitutional rights, courts of
> the United States have power to enjoin state officers from instituting criminal
> actions. But this may not be done, except under extraordinary circumstances,
> where the danger of irreparable loss is both great and immediate. Ordinarily,
> there should be no interference with such officers; primarily, they are
> charged with the duty of prosecuting offenders against the laws of the state,
> and must decide when and how this is to be done. The accused should first
> set up and rely upon his defense in the state courts, even though this involves
> a challenge of the validity of some statute, unless it plainly appears that this
> course would not afford adequate protection.

401 U.S. at 45.

Federal intervention may be proper where there is a showing of "bad faith or

harassment by state officials," or where the state law to be applied in the criminal

proceeding is "flagrantly and patently violative of express constitutional prohibitions.

*Nivens II*, 444 F.3d at 241 (citing *Kugler*, 421 U.S. at 124).  Petitioners do not allege—and

the record does not remotely suggest—that the State engaged in bad faith or harassment.

Nor do Petitioners allege that the relevant North Carolina statutes are "patently violative"

of federal constitutional provisions.  Rather, *Petitioners* initiated the proceedings in state

court in the first place seeking to avail themselves of the RJA remedy.  And Petitioners

concede that they have raised the double jeopardy argument in state court where

proceedings are ongoing.  Petitioners, therefore, must point to some other extraordinary

circumstance "demonstrating that they do not have an adequate remedy at law and the

danger of irreparable injury if they are denied equitable relief is both great and immediate."

15

*Nivens I*, 319 F.3d at 155. For the reasons detailed below, Petitioners fail to make that showing.

## C.

### 1.

Petitioners contend that *Younger* abstention here is inappropriate under the rationale stated in *Gilliam v. Foster*, 75 F.3d 881 (4th Cir. 1996) (en banc). "[T]his Court and the other courts of appeals 'have unanimously recognized that a colorable claim that a second trial will violate a defendant's double jeopardy right is a preeminent example of one of the very few extraordinary circumstances justifying federal court intervention in a pending state criminal proceeding,'" according to Petitioners. Opening Br. 26 (quoting *Gilliam*, 75 F.3d at 904). Stated differently, Petitioners posit that under *Gilliam* an allegation of "a colorable claim" that a double jeopardy violation may occur constitutes an exceptional circumstance that justifies federal court intervention, and no separate showing is necessary. Petitioners are not the first to propose a broad reading of *Gilliam*, and this Court has previously rejected an "overly expansive interpretation of that case." *Nivens I*, 319 F.3d at 159.

The issue on appeal in *Gilliam* was "whether the state trial judge exercised sound discretion in granting the prosecution's motion for a mistrial because the jury viewed certain photographs prior to their formal admission into evidence." 75 F.3d at 885. We held that the petitioners demonstrated they faced a substantial likelihood of an irreparable double jeopardy violation, which qualified as an extraordinary circumstance under *Younger*. *Id.* at 893–95. Our decision not to abstain in that case was rooted in the concerns

16

expressed in *Younger*, that a "portion of the constitutional protection [the Double Jeopardy Clause] affords would be irreparably lost if Petitioners were forced to endure the second trial before seeking to vindicate their constitutional rights at the federal level[.]" *Id.* at 904; *accord Abney v. United States*, 431 U.S. 651, 660 (1977) (observing the constitutional protection afforded by the Double Jeopardy Clause "would be significantly undermined if appellate review of double jeopardy claims were postponed until after conviction and sentence").

In *Nivens I*, we clarified the scope of our decision in *Gilliam*. *Nivens I* concerned whether a district court properly abstained under *Younger* from intervening in a pending state criminal drug prosecution that began after the appellants had paid North Carolina's drug tax. *Nivens I*, 319 F.3d 152. The appellants argued that the Double Jeopardy Clause barred the later criminal prosecution because the drug tax was a criminal penalty that had been satisfied; in effect, they alleged they were being twice punished for the same offense. *Id.* at 152–53. Relying on *Gilliam*, the appellants argued that abstention was improper because "a colorable claim of a double jeopardy violation [was] sufficient to establish exceptional circumstances warranting federal court intervention without any separate showing." *Id.* at 159 (internal quotation marks omitted). We rejected that reading of *Gilliam*, explaining "[w]e did not hold that an allegation of a double jeopardy violation automatically precludes *Younger* abstention." *Id.*

Critically, the *Nivens* appellants had access to avenues for relief in their ongoing criminal prosecutions and state procedures that would allow them to raise their double jeopardy argument before any trial on the merits. We were specific in holding *Younger*

17

abstention was appropriate because "[u]nlike the defendants in [*Gilliam*], Appellants yet have access to pretrial avenues in their current criminal prosecutions whereby they may raise their constitutional contentions before any double jeopardy injury could inure." *Id.* As directly relevant to the arguments Petitioners raise now, we further held that:

> Because jeopardy does not attach during pretrial procedures and motions, and Appellants have state procedures whereby they may foreclose a violation of their double jeopardy rights, any double jeopardy harm at this stage of Appellants' litigation is neither immediate nor irreparable. Appellants must raise their contentions in their current prosecution and appeal any undesirable decision before a federal district court asserts jurisdiction.

*Id.* at 159–60 (internal citations omitted). As a consequence, "[b]ecause Appellants have not made a showing of an immediate and irreparable constitutional injury absent federal court intervention, [*Gilliam*] does not permit us to disregard *Younger*." *Id.* at 160. We held, accordingly, that the district court properly abstained from exercising federal jurisdiction:

> None of this is to say that Appellants ultimately will not prevail on their double jeopardy claim. It is only to say that where the alleged double jeopardy violation is far from clear, immediate, or irreparable, the important *Younger* policy of allowing the State to pursue its prosecution free from federal court intervention outweighs the Appellants' interest in having the double jeopardy issue resolved in a federal forum.

*Id.* at 162.

We reaffirmed that holding when presented with the appropriateness of *Younger* abstention in a later appeal by the same parties. *See Nivens II*, 444 F.3d at 244 ("[T]he fact that [Petitioners] were able to present their claims and have them addressed in state court suffices and continues to make federal intervention inappropriate.").

18

*Nivens I* and *II* control the disposition of this case. Unlike the petitioners in *Gilliam*, but like the petitioners in *Nivens I* and *II*, Petitioners here currently have access to the state trial and appellate courts to present their double jeopardy claims. They are now in the midst of that process, which they must complete before they can make a claim to federal jurisdiction. *See id.* Petitioners concede that they have raised their double jeopardy objections before the state trial court during the ongoing RJA proceedings. See Opening Br. 24, n.14 ("Petitioners acknowledge that they have re-raised the double jeopardy claim in pleadings submitted to the state trial court on remand."). Consequently, Petitioners have not established they will suffer an immediate and irreparable constitutional deprivation.

Since we held oral argument in this case, Petitioners did raise their double jeopardy objections in the state trial court on remand, but did not prevail on that position. Even so, our holding is unchanged by the fact that Petitioners have so far been unsuccessful on the merits. "Abstention does not suddenly become improper simply because Appellants lost on the merits in the state court." *Nivens II*, 444 F.3d at 243; *accord Nivens I*, 319 F.3d at 158 ("Simply put, an assertion that the North Carolina courts will likely decide a constitutional issue in a way contrary to what appellants believe the Constitution mandates is not a sufficient basis to avoid application of *Younger* abstention."). The State need only allow Petitioners the *opportunity* to raise their constitutional argument, it need not agree with that argument. *Moore v. Sims*, 442 U.S. 415, 425–26 (1979) ("Certainly, abstention is appropriate unless state law clearly bars the interposition of the constitutional claims."); *accord Nivens II*, 444 F.3d at 243. That Petitioners have not yet secured the result they

19

seek does not nullify the fact that they had—and, indeed, exercised—the opportunity to raise their double jeopardy claims in state court. *See Younger*, 401 U.S. at 45.

In short, we are constrained by *Nivens I* and *II* to affirm the district court's decision that abstention under *Younger* is appropriate in this case. Petitioners have been able to present their double jeopardy arguments in the state court prior to any proceeding on the merits of their RJA claim. If Petitioners' state court appeals prove unsuccessful, they may have an opportunity at that point to pursue habeas relief in federal court going forward. On that score, we offer no opinion one way or the other. *See* 28 U.S.C. §§ 2241, 2254. Petitioners may not, however, seek federal intervention into their pending state court litigation for a violation of the Double Jeopardy Clause because they have failed to show that North Carolina's pretrial procedures are not able to afford them adequate protection.[6]

2.

Petitioners attempt to distinguish the *Nivens* line of cases because the likelihood of success in that case was deemed "far from clear," and so they assert the equities favored abstention there. They contend that their case, though, presents a more substantial double jeopardy argument. We are not convinced.

Petitioners seek an application of double jeopardy jurisprudence that has an unclear precedential basis and wish to apply it to a novel state law. They rely on *Bullington v.*

---

[6] The State has conceded Petitioners are entitled to raise their double jeopardy argument in state court, and we accept the State's representation at oral argument that it would not assert as a defense a procedural bar to Petitioners' making a double jeopardy argument during the state proceedings by some reading of the North Carolina Supreme Court's order. Oral Argument Audio Recording 20:48-22:40.

*Missouri*, 451 U.S. 430 (1981), and its progeny, which held the Double Jeopardy Clause prohibits the state from resentencing the defendant to death after the sentencer has effectively acquitted the defendant of that penalty by imposing a life sentence following a sentencing proceeding that bears substantially all the hallmarks of a trial. Petitioners rely on the premise that the RJA proceeding transposes into a traditional sentencing hearing in a capital case where the government must demonstrate aggravating factors that warrant the death penalty beyond a reasonable doubt.

Petitioners' premise is "far from clear." While the RJA proceedings share some characteristics of a trial, several features distinguish its statutory scheme from that of a traditional capital case. For one thing, the RJA does not utilize the familiar aggravating and mitigating circumstances approach. Instead, it utilizes a novel post-conviction capital-eligibility criterion unrelated to the particular circumstances of the offense or to any articulated trial error. And the burden of proof under the RJA differs from that of the traditional capital-sentencing proceeding where the State must prove the existence of aggravating circumstances beyond a reasonable doubt. In an RJA proceeding, by contrast, the burden of proof rests with the petitioner under a preponderance of the evidence standard. Such procedural variances appear to be important under the relevant Supreme Court precedent. *See Bullington*, 451 U.S. at 446 ("Missouri's use of the reasonable-doubt standard indicates that in a capital sentencing proceeding, it is the State, not the defendant, that should bear almost the entire risk of error." (internal quotation marks omitted)); *Arizona v. Rumsey*, 467 U.S. 203, 210 (1984) ("The usual rules of evidence govern the admission of evidence of aggravating circumstances, and the State must prove the existence

21

of aggravating circumstances beyond a reasonable doubt."). Thus, while we do not reach the merits of Petitioners contentions, we also do not accept their premise that their cases are unquestionably destined to succeed. As a consequence, Petitioners do not proffer a credible basis upon which to distinguish this Court's germane holdings in *Nivens I* and *II*.

Petitioners also rejoin that *Nivens I* and *II* are inapplicable because the double jeopardy problem presented in that case involved multiple punishments, not multiple prosecutions. The double jeopardy issue in this case relates to multiple prosecutions, they counter. That simply isn't so, as the only issue in this case is punishment, specifically, whether Petitioners are entitled to an alteration of their death penalty sentence under North Carolina's RJA. There is no second "prosecution" by the State.

In short, Petitioners have not demonstrated exceptional circumstances or substantial danger of irreparable harm that justifies federal intervention in ongoing state proceedings.

\*\*\*

In conclusion, we are not tasked with determining whether Petitioners' double jeopardy claims will ultimately prove successful. Our sole consideration is whether a federal court, under *Younger*, should take the remarkable step of intervening in ongoing state court proceedings to decide federal constitutional issues for that court. We should not and do not take such a drastic departure from the normal course as none of the exceptions to *Younger* applies. We hold, therefore, the district court did not abuse its discretion when it abstained from exercising jurisdiction to decide Petitioners' double jeopardy claims.

22

## IV.

For the reasons stated above, we affirm the judgments of the district courts dismissing the petitions without prejudice.

*AFFIRMED*