PUBLISHED

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 18-7242

BRODERICK WILLIAM SEAY, JR.,

Petitioner - Appellant,

v.

SHERIFF AL CANNON,

Respondent - Appellee.

Appeal from the United States District Court for the District of South Carolina, at Charleston. Timothy M. Cain, District Judge. (2:17-cv-02814-TMC)

Argued: January 29, 2019                    Decided: June 21, 2019

Before NIEMEYER, KEENAN, and QUATTLEBAUM, Circuit Judges.

Vacated and remanded with instructions by published opinion. Judge Keenan wrote the opinion, in which Judge Quattlebaum joined. Judge Niemeyer wrote a dissenting opinion.

**ARGUED:** Jason Scott Luck, GARRETT LAW OFFICES, LLC, Charleston, South Carolina; Sara Alexandra Turner, LAW OFFICE OF SARA A. TURNER, LLC, Charleston, South Carolina, for Appellant. Melody Jane Brown, OFFICE OF THE ATTORNEY GENERAL OF SOUTH CAROLINA, Columbia, South Carolina, for Appellee. **ON BRIEF:** Alan Wilson, Attorney General, Donald J. Zelenka, Deputy Attorney General, OFFICE OF THE ATTORNEY GENERAL OF SOUTH CAROLINA, Columbia, South Carolina, for Appellee.

BARBARA MILANO KEENAN, Circuit Judge:

Broderick William Seay, Jr. appeals from the district court's denial of his petition for habeas corpus relief under 28 U.S.C. § 2241. Seay argues that his rights under the Double Jeopardy Clause of the Fifth Amendment will be violated if the State of South Carolina (the government) retries him on murder charges in state court. The state trial court granted a mistrial in the original proceedings based on the failure of the government's critical witness to appear at Seay's trial. In Seay's view, the government failed to meet its burden of showing manifest necessity for a mistrial after the jury was empaneled and jeopardy had attached. The district court denied habeas relief, holding that under the facts presented it was appropriate to defer to the state trial court's finding of manifest necessity.

Employing "strictest scrutiny" review, we conclude that the government failed to satisfy its high burden of showing manifest necessity for a mistrial. The record shows that the government allowed the jury to be empaneled knowing that the crucial witness might not appear to testify. Additionally, the state trial court failed to consider possible alternatives to granting the government's mistrial motion. We therefore vacate the district court's judgment, and remand with instructions that the district court award Seay habeas corpus relief.

I.

In 2015, a South Carolina grand jury indicted Seay on a charge of murder, in violation of South Carolina Code § 16-3-10. The government alleged that two of Seay's

2

co-conspirators, Kevin Howard and Tyrone Drayton, kidnapped the victim, Adrian Lyles, from his home in 2012. According to the government, Seay later joined the group and, together with Howard and Drayton, drove to a remote South Carolina island where the three men shot Lyles a total of ten times in retaliation for Lyles' work as an informant for law enforcement authorities.

Howard was the first co-conspirator tried for murder. At that trial, Howard's former girlfriend, Startasia Grant, testified as a cooperating witness for the government.[1] Most relevant here, Grant testified that she joined Howard, Seay, and Drayton shortly after the time that Lyles was killed. When Grant first encountered the group, she noticed that Howard's hand was bleeding and that the three men acted "agitated" and "jumpy." Grant also testified about her interactions with the men in the hours following the murder, including her suspicion that Howard was carrying a bag with a shotgun inside. Her testimony placed Seay with the co-conspirators around the time of the murder.

After hearing additional evidence in the case, the jury found Howard guilty on the charge of murder. The state court sentenced Howard to serve a term of life imprisonment. At the time Grant testified at Howard's trial, she had been charged with obstruction of justice for her role in attempting to "cover up" the crime. However, the government dismissed that charge after Grant testified at Howard's trial.

More than two years after Howard's trial, in June 2016, the government issued a subpoena requiring Grant to testify at Seay's trial. Pursuant to the subpoena, Grant was

---

[1] The record contains inconsistent spellings of Grant's first name. We use the spelling included on the government's witness list and subpoena for Seay's trial.

3

directed to appear in the state trial court at 9:00 a.m. on "each day" of the term of court beginning on Monday, July 25, 2016. The subpoena also explained that the prosecutor's office "may be able to give [the witness] a more specific date and time to appear in Court" under certain circumstances, but nothing in the record indicates that the government advised Grant not to appear as directed on Monday.

The trial was scheduled to begin on the first day of that term, Monday, July 25, 2016. Although the prosecutor and the government's investigator spoke with Grant the weekend before the scheduled trial, Grant did not appear as required that Monday. For reasons unrelated to Grant's failure to appear, the court continued the trial to the next day.

When the court convened the following day, Tuesday, July 26, 2016, Grant again failed to appear as required by her subpoena. Despite the absence of this crucial witness, the government did not seek to delay the trial, and the jury was empaneled. The government presented testimony from eight witnesses on the first day of trial. Meanwhile, the government's investigator attempted to contact Grant and left multiple messages directing her to appear in court the following morning.

On Wednesday, July 27, 2016, Grant once again failed to appear in court as ordered. After the government presented the testimony of one additional witness, the government for the first time raised to the state trial court the issue of Grant's nonappearance. The government informed the court that, since speaking with Grant on

4

Saturday, Grant had "not been cooperative with [the prosecutor's] office at all."[2] The state trial court issued a bench warrant for Grant's arrest, and adjourned court until the next day to permit law enforcement authorities to attempt to locate her. When the court reconvened the following day, Thursday, July 28, 2016, the authorities had not located Grant, and she again failed to appear pursuant to the subpoena.

The government immediately moved for a mistrial, claiming surprise that Grant had failed to appear as a witness. The government further stated: "We are asking for a mistrial because at this point we do not know if [] Grant is alive. We do not know if she has been injured. We do not know if she is just scared. We do not know if she has been threatened." Seay opposed the mistrial motion, arguing that there was no evidence that he had attempted to dissuade Grant from testifying, and that the government had failed to meet the manifest necessity standard required for ordering a mistrial. After hearing further argument from counsel, the state trial court, as part of its basis for granting the motion, stated: "I do feel that the State has been caught by surprise. . . . [T]he case is ongoing as of this moment. I think the public is entitled to a fair trial as is" the defendant. The court then granted a mistrial without any consideration on the record of other measures that could have been taken.

---

[2] The government represented to the state trial court that Grant had informed the government's investigator in a text message sometime on Tuesday, July 26, 2016, or on Wednesday, July 27, 2016, that she did not intend to testify because she was frightened. The government, however, failed to preserve the text message or the investigator's electronic device. Instead, the record contains only an unverified statement of the purported text message.

5

Seay later filed a motion to dismiss the indictment in state court, asserting that the constitutional protection against double jeopardy barred him from being retried on the state murder charge. After the state trial court denied Seay's motion, Seay filed a petition in the federal district court seeking habeas corpus relief under 28 U.S.C. § 2241 on the ground that a second trial would violate his rights under the Double Jeopardy Clause.[3] On the recommendation of the magistrate judge, the district court denied Seay's petition. However, the district court granted a certificate of appealability, and Seay now appeals to this Court.

## II.

## A.

We review de novo the district court's denial of habeas corpus relief under 28 U.S.C. § 2241. *Fontanez v. O'Brien*, 807 F.3d 84, 86 (4th Cir. 2015). Because Seay challenges his pretrial detention on double jeopardy grounds under Section 2241, the special deference we ordinarily accord to state court judgments under 28 U.S.C. § 2254 is inapplicable here. *See Phillips v. Court of Common Pleas*, 668 F.3d 804, 810 (6th Cir. 2012) (collecting cases from First, Fifth, Ninth, and Tenth Circuits); *see also Walck v. Edmondson*, 472 F.3d 1227, 1235 (10th Cir. 2007). Section 2241 entitles a prisoner to

---

[3] At Seay's request, the state court agreed to continue the trial until final adjudication of Seay's Section 2241 petition.

6

habeas corpus relief if "[h]e is in custody in violation of the Constitution or laws or treaties of the United States."[4]  28 U.S.C. § 2241(c)(3).

The Double Jeopardy Clause of the Fifth Amendment, applicable to the states through the Fourteenth Amendment, prohibits states from subjecting a person to trial twice for the same crime. *See Crist v. Bretz*, 437 U.S. 28, 32-36 (1978).  "In a jury trial, jeopardy attaches when the jury is empaneled," after which "the defendant has a constitutional right, subject to limited exceptions, to have his case decided by that particular jury." *United States v. Shafer*, 987 F.2d 1054, 1057 (4th Cir. 1993) (footnote omitted).  Those exceptions apply only when the defendant's right is outweighed by "the public's interest in fair trials designed to end in just judgments." *Id.* (citation omitted). Accordingly, when a defendant objects to a mistrial, he may be retried only if the mistrial was "required by 'manifest necessity.'" *Id.* (quoting *Arizona v. Washington*, 434 U.S. 497, 505 (1978)); *see also Gilliam v. Foster*, 75 F.3d 881, 893 (4th Cir. 1996) (en banc).

The government's burden of establishing manifest necessity is "a heavy one," and is subject to especially searching review when the government seeks a mistrial "in order to buttress weaknesses in [its] evidence." *Arizona*, 434 U.S. at 505, 507.  Thus when, as

---

[4] Under South Carolina law, Seay may not raise his double jeopardy arguments in an interlocutory appeal.  *See State v. Rearick*, 790 S.E.2d 192, 195, 199 (S.C. 2016). Thus, because South Carolina's procedures do not afford Seay adequate protection against a double jeopardy violation, we do not abstain from intervention in the ongoing state criminal proceedings pursuant to *Younger v. Harris*, 401 U.S. 37 (1971).  *See Robinson v. Thomas*, 855 F.3d 278, 285-89 (4th Cir. 2017).

here, "the basis for the mistrial is the unavailability of critical prosecution evidence,"[5] we apply "the strictest scrutiny" to the question of manifest necessity. *Id.* at 508. With these principles in mind, we proceed to consider Seay's arguments.

B.

Seay argues that the district court erred in concluding that the state trial court's finding of "manifest necessity" is supported by the present record. In Seay's view, the decision granting a mistrial fails under strictest scrutiny review because (1) the government was aware at the time the jury was empaneled that Grant might not appear to testify, and (2) the state trial court failed to consider other available alternatives.

In response, the government relies on the state trial court's finding that the government was "caught by surprise" when Grant failed to appear in response to the subpoena. According to the government, this factual finding and the lack of any fault on the government's part support the state trial court's determination that a mistrial was warranted for reasons of manifest necessity. We disagree with the government's position.

The Supreme Court, in *Downum v. United States*, 372 U.S. 734, 737-38 (1963), explained that the double jeopardy inquiry focuses on the state's knowledge at the time the jury is empaneled. The Court emphasized that when a prosecutor empanels a jury "without first ascertaining" that his witnesses are present and available to testify, the

---

[5] The state trial court found that Grant was a critical prosecution witness. The parties do not dispute this characterization.

8

prosecutor "t[akes] a chance."[6]  *Id.* at 737 (quoting *Cornero v. United States*, 48 F.2d 69, 71 (9th Cir. 1931)).  According to the Court, under these circumstances, the prosecutor has "entered upon the trial of the case without sufficient evidence to convict," thereby assuming the risk of jeopardy attaching in the face of weak government evidence.  *Id.* (citation omitted).  Thus, the essence of the Court's holding in *Downum* is that when a prosecutor agrees to the empaneling of a jury, gambling that his missing witness will appear in time to testify, the prosecutor subjects his case to a defendant's later plea of double jeopardy.  *See id.* at 737-38.  As the Court explicitly stated, "[w]e resolve any doubt in favor of the liberty of the citizen, rather than exercise what would be an unlimited, uncertain, and arbitrary judicial discretion."  *Id.* at 738 (internal quotation marks and citation omitted).

In the present case, the record shows that the government allowed jeopardy to attach with the awareness that Grant, a critical government witness, might not appear to testify.  The timeline in the record is dispositive.  Grant was compelled by subpoena to appear in court for the full term of court beginning on Monday, July 25, 2016, but she did not comply with that directive.  Nor did Grant appear the following morning on Tuesday, July 26, 2016, before the jury was empaneled.  On Wednesday, July 27, 2016, the government informed the court that Grant "ha[d] not been cooperative with [the prosecutor's] office at all" after state officials had spoken with her the Saturday before

---

[6] In *Downum*, although the prosecutor had not served a summons on the witness requiring his appearance before the trial court, the Supreme Court did not assign particular weight to that fact in determining that the government failed to show manifest necessity for a mistrial.  *See* 372 U.S. at 737.

trial. The prosecutor and state investigator had attempted to locate Grant several times between Monday and Wednesday morning during the week of trial, including visiting Grant's apartment and place of employment, contacting Grant's sisters, and sending Grant multiple text messages.

Reading this record in its totality, two facts are apparent. First, the government knew that its crucial witness had failed to appear as required by subpoena for two consecutive days before the jury was empaneled. The government nevertheless allowed jeopardy to attach, risking the foreseeable possibility that Grant would not appear in time to testify.

Second, given the serious nature of the case, the government plainly was concerned throughout the week of trial that Grant might not appear. The government knew that its star witness was being asked to testify against a defendant charged with murdering a "snitch." The government also knew that it had relinquished its leverage over Grant by dismissing the obstruction charges that had induced Grant to testify in the earlier trial. Indeed, one of the government's justifications for seeking a mistrial was the speculation that Grant had been harmed to prevent her from testifying. Consistent with this background knowledge, as noted above, the prosecutor and investigator took several steps to locate Grant on Monday and Tuesday during the week of trial.

In view of these facts, we disagree with the dissent's assertion that the government employed a "standard procedure for calling subpoenaed witnesses to testify in multiday trials," and instructed Grant not to appear until the Wednesday of trial. Dissent at 20. Although Grant's subpoena indicated that the prosecutor's office "may be able to"

10

provide a more specific date for Grant's testimony, nothing in the record suggests that the prosecutor in fact followed such a practice with Grant. The mere fact that the prosecutor *could have* done so says nothing about what the prosecutor actually told Grant. And, notably, the government never told the state trial court that Grant was not required to appear on the Monday and Tuesday of trial as commanded by her subpoena.[7] Under our "strictest scrutiny" standard of review, we cannot construe such absence of factual support in the record in favor of the state.

Applying our heightened standard of review, we conclude that the record does not support the conclusion that the government was surprised when Grant failed to appear to testify. We emphasize that it was the government's heavy burden to establish manifest necessity and to develop the record to support such a finding, even in the dynamic context of a murder trial. For example, the government: (1) could have stated clearly whether it had relieved Grant of her obligation under the subpoena to appear on Monday and Tuesday; (2) could have clarified the timeline and contents of state officials' communications with Grant both before and during the trial; and (3) could have preserved on the record the text message allegedly received by the government investigator indicating that Grant was afraid to testify. *See supra* note 2. The dissent attempts to supplement these gaps in the record with its own speculation about what

_____

[7] While we agree that the record "conclusively shows" that the government directed Grant to appear in court on the Wednesday of trial, we emphasize that this fact does not "conclusively show" that the government had directed Grant *not* to appear *until* Wednesday. Dissent at 33. Moreover, the dissent's characterization of this timeline is undermined by the government's numerous attempts to locate Grant between Monday and Wednesday morning.

11

"must" or "should" have happened, and construes all aspects of the existing record in favor of the government. However, bound by strictest scrutiny review, we decline to remedy the government's failure to satisfy its burden by inserting hypothetical "facts" into the record.

The heart of the constitutional protection against double jeopardy prohibits the government from obtaining a "second bite at the apple" when the government has been unable to marshal sufficient evidence to convict in the first trial. *See Shafer*, 987 F.2d at 1059; *Sanders v. Easley*, 230 F.3d 679, 686 (4th Cir. 2000) (at the "extreme" end of the spectrum when double jeopardy applies "are situations in which the prosecution seeks a mistrial in order to have additional time to marshal evidence to strengthen the case against the defendant"). Here, given the government's failure to produce its own witness in a timely fashion, a mistrial was not manifestly necessary because of surprise to the government. Instead, the mistrial afforded the government "a more favorable opportunity to convict" the defendant at a new trial with the testimony of the missing witness. *Downum*, 372 U.S. at 736. Accordingly, we conclude that the government's allegation of surprise fails to support the state trial court's finding of manifest necessity.

Notwithstanding this absence of surprise, the government nevertheless maintains that the record supports the state trial court's decision to grant a mistrial. In particular, the government contends that the state trial court exercised a "cautious approach" before granting a mistrial, by continuing the trial overnight while law enforcement authorities sought to locate the missing witness. Accordingly, the government argues that because Grant "was such a critical witness, and the remaining witnesses to be called in the case in

12

chief depended on her testimony, it is difficult to see an actual, viable, sufficient alternative available" to the state trial court. We disagree with the government's position.

In determining whether the government has satisfied its burden to show manifest necessity, "the critical inquiry is whether less drastic alternatives were available." *Shafer*, 987 F.2d at 1057; *see also United States v. Jorn*, 400 U.S. 470, 487 (1971) (plurality opinion) (manifest necessity did not exist when trial judge gave "no consideration . . . to the possibility of a trial continuance" instead of a mistrial). When such alternatives are available, "society's interest in fair trials designed to end in just judgments [is] not in conflict with the defendant's right to have the case submitted to the jury." *Shafer*, 987 F.2d at 1057 (internal citation and quotation marks omitted).

And when, as here, the strictest scrutiny standard of review applies, the trial court's consideration of reasonable alternatives is a central factor in our heightened review of manifest necessity. All alternative options must be evaluated, and all reasonable choices exhausted, before the government may reap the benefit of a second opportunity to prove a defendant's guilt. We thus agree with our sister circuits' conclusion that, applying strictest scrutiny review, the government must demonstrate that the trial court gave "careful consideration" to the availability of reasonable alternatives to a mistrial, and that the court concluded that none were appropriate. *United States v. Fisher*, 624 F.3d 713, 722 (5th Cir. 2010); *see also Walck,* 472 F.3d at 1240; *United States v. Rivera*, 384 F.3d 49, 56 (3d Cir. 2004). If the trial court's assessment of

13

reasonable alternatives does not appear on the record, a finding of manifest necessity will not be upheld under the lens of strictest scrutiny.[8] *See Fisher*, 624 F.3d at 723.

In the present case, as discussed above, Grant failed to comply with the terms of her subpoena, which required her to appear for court on Monday, July 25, 2016, Tuesday, July 26, 2016, and Wednesday, July 27, 2016. After Grant did not appear on those days, despite the government's multiple attempts to contact her, the state trial court issued a bench warrant for her arrest on Wednesday, July 27, 2016, and adjourned the trial until the following morning. The government requested a mistrial shortly after the court reconvened on Thursday, July 28, 2016, on the basis that law enforcement authorities had been unable to locate Grant. After oral argument, the court granted the mistrial.[9]

While the state trial court explained its rationale for granting the motion, the record before us does not show that the court considered any available alternatives before granting the government's mistrial motion. For example, the court did not discuss why it did not continue the trial one additional day, or over the weekend until the following

---

[8] We recognize that the Supreme Court in *Arizona* did not require trial courts to articulate on the record reasons for finding manifest necessity. 434 U.S. at 517. However, that portion of the analysis in *Arizona* does not govern the very different circumstances present here. The Court in *Arizona* accorded "great deference" to the trial court's evaluation of whether potential juror bias warranted a mistrial. *Id.* at 510, 514. In contrast, here, we apply the much more rigorous "strictest scrutiny" review, applicable to "extreme" cases in which the government seeks a mistrial "in order to buttress weaknesses in [its] evidence." *Id.* at 507-08.

[9] The following day, Friday, July 29, 2016, law enforcement authorities successfully executed the bench warrant and arrested Grant. She was detained and, one month later, was found in contempt of court for her failure to comply with the subpoena.

14

Monday, August 1, 2016, to give law enforcement authorities additional time to locate Grant. Likewise, the court failed to discuss why it did not require the government, which had 18 remaining witnesses listed for the case, to present testimony from some of those witnesses while the efforts to locate Grant continued.[10] Thus, the record contains no analysis of potential alternatives to a mistrial as required by our precedent. Without considering the viability of possible alternatives, the "drastic" step of declaring a mistrial is not supported by the record. *See Shafer*, 987 F.2d at 1057; *Rivera*, 384 F.3d at 56 (holding that a trial court "must exercise prudence and care, giving due consideration to reasonably available alternatives to the drastic measure of a mistrial").

We therefore conclude that the state trial court erred in finding manifest necessity for a mistrial, and that the district court erroneously accorded deference to that decision. In doing so, we "resolve any doubt in favor of the liberty of the citizen," who was defending against the charged offense when the state trial court abruptly ended the trial and dismissed the jury. *Downum*, 372 U.S. at 738 (internal quotation marks omitted).

Finally, we emphasize that this case sharply illustrates the consequences of the government's too ready reliance on the short-term solution of a mistrial to solve a common trial predicament. The clear loser in this scenario is the public, which had a

---

[10] The government maintains that, although its witness list included 18 additional witnesses, the government only planned to call "two or three" of these witnesses. According to the government, these two or three witnesses would provide cell phone location evidence, and their testimony would lose its "corroborative value" without Grant's testimony detailing Seay's movements following the murder. However, these issues, including the possibility of altering the planned order of proof, should have been fully discussed and evaluated by the state trial court before a mistrial was granted.

15

strong interest in having Seay tried under the murder indictment. However, as a result of the government's ill-advised request for a mistrial, approved by the state trial court without consideration of existing alternatives, Seay is entitled to the habeas corpus relief that will afford him his constitutional rights under the Double Jeopardy Clause.

III.

For these reasons, we vacate the district court's judgment, and remand the case to the district court with instructions to grant Seay's petition for habeas corpus relief under 28 U.S.C. § 2241.

*VACATED AND REMANDED WITH INSTRUCTIONS*

NIEMEYER, Circuit Judge, dissenting:

Broderick Seay, Jr., was charged in a South Carolina state court in 2015 with the first-degree murder of Adrian Lyles on March 28, 2012. The prosecution alleges that Lyles was taken to a remote area and shot ten times, "execution-style," with three different types of ammunition by three men, one of whom was Seay, because they believed that Lyles was a "snitch." In April 2016, after one of the three men was tried and convicted of the murder, the court scheduled Seay's case for trial, beginning the week of July 25, 2016.

On the second day of trial, the State's key witness, who had testified in the earlier case and was cooperating with the State in its prosecution of Seay, failed to appear for trial as directed by subpoena and the prosecutor. The prosecutor claimed surprise and, after law enforcement officers were unable to locate the witness during a 24-hour continuance, requested a mistrial. Finding that the prosecutor was indeed surprised and acting in good faith, the judge declared a mistrial.

When the State sought to retry Seay, he raised a double jeopardy defense, which that state court denied. He thereafter sought federal habeas relief, which the district court also rejected. But the majority now finds — for the first time on appeal and contrary to the record and the findings of three state judges and two federal judges — that the state prosecutor *knew* before the jury's empanelment that the witness was missing and might not appear for trial but nonetheless proceeded with the empanelment of the jury, thus gambling on whether the witness would appear. Relying on *Downum v. United States*, 372 U.S. 734, 737 (1963) (holding that such gambling precludes the demonstration of

17

manifest necessity necessary for a mistrial), the majority thus concludes that the State did not demonstrate manifest necessity for the mistrial based on the prosecutor's contention that she had been caught by surprise. And it further concludes that the state trial court erred in failing to consider reasonable alternatives to a mistrial. Based on these two conclusions, it holds that Seay cannot be retried.

Not only is this ruling a profound shock to public justice, but the facts on which it is based are unsupported by the record.

As I demonstrate in detail hereafter, a month before trial, the State subpoenaed its star witness, Startaesia Grant, to testify at Seay's trial. She had testified in the earlier trial of Seay's alleged coconspirator and was cooperating with the State in its prosecution of Seay. The subpoena commanded Grant to appear at trial during the July 25, 2016 term, "each day this term of court or until disposition of case." But, consistent with common practice, the subpoena also explicitly stated that if Grant provided the prosecutor's office with her contact information, she might not have "to attend court on each day of the entire term," but could instead appear at "a more specific date and time," as specified by the prosecutor. And in this case, the prosecutor directed Grant to appear to testify on Wednesday, July 27, 2016, the second day of trial.

When Grant did not appear for trial on July 27, the prosecutor explained to the court that Grant had been cooperative as recently as Sunday, July 24, but then had failed to return phone calls and text messages, only to suddenly declare on Tuesday night, July 26 — the night before her expected testimony — that she was too frightened to appear the next day, as directed. The prosecutor requested that the court issue a bench warrant

18

for Grant's appearance and postpone the trial to the next day to accommodate efforts to bring her in. The court granted both requests. The next morning, when law enforcement officers stated that they had been unable to find Grant, the State filed a motion for a mistrial. The court reviewed the facts and law and received arguments from counsel, after which it found "that the State ha[d] been caught by surprise" and had demonstrated "manifest necessity" for a mistrial, quoting *Arizona v. Washington*, 434 U.S. 497, 506 (1978). It concluded that it would be in the public interest to grant the mistrial in the "unique circumstances" of the case.

When the State scheduled a retrial, Seay filed a motion in state court to dismiss the case on double jeopardy grounds, and after the state court denied his motion, he filed this habeas petition in the district court under 28 U.S.C. § 2241, again contending that to start the trial again would violate his rights under the Double Jeopardy Clause of the U.S. Constitution. The district court denied Seay's petition.

The majority now reverses both the state court and the district court, holding that Seay cannot be tried for murder because the state trial judge erred in finding that the state prosecutor was surprised by Grant's failure to appear for trial on July 27 and in ordering a mistrial. In doing so, the majority effectively overrules the factfinding of the state trial judge and engages in factfinding on its own, finding first that the state prosecutor expected Grant to be in court both on Monday, July 25, and Tuesday, July 26, pursuant to the terms of the subpoena, and from there reasoning that because the prosecutor knew that Grant had not appeared on those days, she chose to gamble by proceeding with the jury's empanelment on July 26. *See ante* at 9–10. But the majority's underlying finding

19

that Grant had been required by her subpoena to appear in court on July 25 and July 26 is flawed, as it rests on an incomplete reading of the subpoena and disregards all the record evidence indicating that the prosecutor did not expect Grant to appear until July 27. Similarly, the majority emphasizes that at *sometime "between* Monday and Wednesday morning during the week of trial" the State "took several steps to locate Grant." *Ante* at 10. But the fact that efforts were made to locate Grant at some point after she temporarily stopped returning phone calls and text messages hardly justifies the majority's factual finding that the government was aware *on the morning of Tuesday, July 26* that Grant would not appear to testify. *See ante* at 9. Finally, the majority's conclusion that the state trial court acted too rashly in declaring a mistrial without considering the availability of reasonable alternatives fails to give due regard to the unique circumstances with which the state trial court was confronted and the considered actions it actually took.

At bottom, the majority's factfinding is unsupported by the record, and its analysis is accordingly flawed. And on this basis, it denies South Carolina the right to a full and fair trial of Seay for a gruesome murder, a ruling that, in my judgment, is totally unnecessary.

I

At the outset, it is remarkable that the majority does not acknowledge the standard procedure for calling subpoenaed witnesses to testify in multiday trials. Subpoenas routinely require witnesses to appear on every day of a trial, which gives the lawyer

20

calling the witness the authority and flexibility to decide when to have the witness actually appear. It is thus perfectly ordinary for lawyers not to require their subpoenaed witnesses to appear on a trial's first day, even if the subpoena covers the trial's entire expected duration. Rather, the witnesses are required to respond to the lawyer's directions on when to appear, as the subpoena gives the lawyer that authority. This practice was acknowledged by the state judge who denied Seay's double jeopardy motion when he observed that he had practiced law for 21 years and "didn't make [subpoenaed witnesses] come sit in the courtroom until I called them."

Moreover, the subpoena in this case, which was served on Grant a month before trial, incorporated this standard practice, clearly indicating that Grant would not be required to appear on the first day of trial if she were in contact with the prosecutor. More specifically, while the subpoena did direct Grant to appear at the courthouse at 9:00 a.m. on "each day" of the term of court beginning on Monday, July 25, 2016, it also directed Grant to provide the prosecutor's office with contact information for "where you can be reached during this term of Court" and stated that "if you promptly furnish this office with your contact information, it may not be necessary for you to attend court on each day of the entire term set forth in this subpoena." Instead, "we may be able to give you a more specific date and time to appear in Court for the disposition of this case." By contrast, the subpoena warned Grant that if she did *not* provide the prosecutor's office with her contact information, then she "*must appear in Court at the time and place set forth in this subpoena.*" (Emphasis in original.) Moreover, consistent with this language in the subpoena, the record reflects that before jury selection began on the trial's first day,

21

the prosecutor asked the judge a scheduling question because she was "trying to figure out when [she] need[ed] to get [a particular] witness" to the courthouse whom she expected to call that afternoon — a further indication that the prosecutors in this case were not requiring their subpoenaed witnesses to appear before trial began each day.

Grant, who had already testified in the successful prosecution of Seay's alleged coconspirator, was a critical witness for the State's prosecution of Seay. And in preparation for Seay's trial, as the prosecution team represented, "[s]he frequently met with the State and participated in interviews each time [the prosecutors] requested. As recently as the Saturday before the trial, Ms. Grant was engaged with [the prosecutors] in trial preparation," and she "showed no reticence in cooperating."

The trial was scheduled to begin on Monday, July 25, but was postponed for a day due to a discovery issue. On Tuesday, July 26, the jury was empaneled at around 11:30 a.m., and the State proceeded to present testimony from eight witnesses before court adjourned for the day.

Meanwhile, an investigator with the prosecutor's office attempted to get in touch with Grant to check in with her and to tell her that she was required to appear on Wednesday, July 27. But Grant did not answer her phone or immediately return any messages, and the investigator at some point took steps to locate her, visiting her apartment and workplace and contacting her sisters, but without success. After finishing with the trial's first day, the prosecutor also sent Grant a text message, telling her "that she needed to be in court at 9:00 [a.m.]" the next morning. The investigator likewise texted Grant again and repeated "that she needed to be present at 9:00 over at the

courthouse." Grant responded to the investigator with a text message that night, stating for the first time that she was "scared as hell" and no longer willing to testify. She explained, "I can't afford for any of my loved ones to be harmed, I am all that my son has[,] he has no daddy[,] so I decided not to take the stand and I'm willing to accept all consequences. Jail time is better than leaving my son in this world without a mother."

As she had indicated, Grant did not appear in court as instructed on the morning of Wednesday, July 27. The prosecutor explained the situation to the trial judge and requested that the court issue a bench warrant for Grant's appearance and postpone the trial until the next morning. Counsel for Seay — who noted that he had spoken to Grant by phone on Sunday, July 24 — did not object, and the court then issued the bench warrant at 10:06 a.m. on July 27. The text of the bench warrant noted that Grant had been "advised by telephone communications to be present in the General Sessions Court of Charleston County on Wednesday, July 27, 2016, at 9:00 a.m., pursuant to the issued subpoena." The court also granted the prosecutor's motion for a postponement and adjourned trial until the next morning to allow law enforcement officers time to bring Grant in.

On Thursday morning, July 28, after law enforcement reported that they had been unable to find Grant, the prosecutor so advised the court and then moved for a mistrial, explaining to the court that Grant "did not show up to court yesterday after being advised by me as to when to come and by my investigator . . . as to when to come." The prosecutor explained that Grant had "sent a text to my investigator indicating that she was scared and that she would not be coming." The prosecutor then stated:

23

I would like to state for the record that this is not a situation where the State failed to have a witness subpoenaed before trial started. This is not a situation where the State is requesting a mistrial for any reason to better our case recognizing it was weak or in any way inflict any type of injustice toward the Defendant.

We are asking for a mistrial because at this point we do not know if Startaesia Grant is alive. We do not know if she has been injured. We do not know if she is just scared. We do not know if she has been threatened. . . . I have practiced law since 1986. My investigator has been an investigator for 26 years. And neither he nor I have ever had this situation arise. So it is not something that is frequently an issue in trial.

After arguing the applicable caselaw, the prosecutor stated to the court that "obviously the State needs one fair and full opportunity to present the evidence [to] the jury." She added:

This is no manipulation on the part of the State. We have been prepared. We had her served. We met with her. We want a just end result not only for the public's interest, but for the interest of the victim as well.

The prosecutor further emphasized the seriousness of the murder charge and the public interest at stake, stating, "[A]ll those involved in the killing in this case need justice."

In response to the State's motion, counsel for Seay emphasized that jeopardy attached in the case on Tuesday, July 26, when the jury was sworn. He then argued:

[W]hen I looked at the caselaw here well obviously, Judge, if there had been any sort of decision that had been made by the jury itself, then it is absolutely certain that a mistrial would not be appropriate at all. So we are kind of in a gray area that's in between opening statements, jeopardy attaching, and a decision that's been made by the jury.

Counsel for Seay also explained that his client had been waiting for trial for almost two months, that the crime had occurred almost four years ago, and that Seay had been

24

charged two years ago. He concluded by arguing that the State had failed to show "manifest necessity or . . . the best interest of the public."

After listening to counsel, State Judge G. Thomas Cooper granted the motion for a mistrial, explaining:

> Having read basically the same caselaw that both of you have read and put on this record, I wanted to make a complete record of this proceeding. *I do feel that the State has been caught by surprise. I have no reason to believe that the State has concocted this factual situation to aid in the trial of your client.* I think it has created a fact that this witness is a critical witness to the prosecution of the Defendant and the almost simultaneous absence of the witness once the case is called and once the witness is called based on the fact as you have both pointed out the witness was available as of perhaps Friday or as late as Sunday before the trial started on Monday and then to have her disappear when her name is called is in my opinion *not the fault of either one of you*. There is obviously a reason this Court is not aware of as to why she's not available.
>
> I think it does fall within the rubric of *Arizona v. Washington* that this creates and I will use the word manifest necessity to grant a mistrial.
>
> \*    \*    \*
>
> I think the public is entitled to a fair trial as is your client. And these unique circumstances I think compel this Court to grant a mistrial and I so do at this time. I grant a mistrial to the State and this case for this time has ended.

(Emphasis added). In dismissing the jury, Judge Cooper explained that it had "been a struggle . . . to try to determine how to proceed in this matter" but that he had concluded that he had "no choice" but to declare a mistrial.

Grant was subsequently arrested and found in contempt of court. As State Judge Kristi L. Harrington ruled, following a hearing, "the Defendant was served with a lawful subpoena and failed to appear in court *on July 27, 2016. . . .* Following the presentation

25

of evidence by the State, and with the Defendant offering no justifiable defense *for failing to appear in court on July 27, 2016*, the Court finds [Grant] is in willful violation of a lawful subpoena constituting an indirect civil contempt of court violation." (Emphasis added).

When the State rescheduled Seay's trial, Seay filed a motion in state court to dismiss the case on double jeopardy grounds. After a full hearing, State Judge R. Markley Dennis, Jr., issued an order finding the operative facts and denying the motion. The court found:

> Prior to trial, Ms. Grant was cooperative with the State and prepared to testify during the Defendant's trial. Ms. Grant was served a subpoena and showed no reticence in cooperating. She frequently met with the State and participated in interviews each time it was requested. As recently as the Saturday before the trial, Ms. Grant was engaged with the State in trial preparation. The State learned prior to jury selection, that defense counsel spoke with Ms. Grant the Sunday evening before trial.

> On July 26, [2016], a jury was selected and sworn, the witnesses were sequestered, and several witnesses testified. The evening before Ms. Grant was scheduled to testify, she did not answer phone calls from the State's Investigator, Keith Hair. He left her voice and text messages instructing her to appear in court the following morning at 9:00 am. She did not show up at the appointed time. The State brought this matter to the attention of the Court and requested a bench warrant be issued to secure her presence. The Court granted a twenty-four-hour recess to allow the United States Marshalls time to locate Ms. Grant. . . .

> The United States Marshalls were unable to locate Ms. Grant during the twenty-four-hour recess. As a result, the State moved for a mistrial. The Honorable Thomas Cooper heard the matter in full. After hearing arguments from the State and Defense, Judge Cooper declared a mistrial.

> In granting the mistrial, Judge Cooper found "I do feel that the State has been caught by surprise. I have no reason to believe that the State has concocted this factual situation to aid in the trial of your client." Further, Judge Cooper ruled, "I think it falls within the rubric of *Arizona v.*

26

*Washington* that this creates and I will use the word manifest necessity to grant a mistrial. And there certainly is a public interest in the fair trial of the Defendant." Judge Cooper also held, "I think the public is entitled to a fair trial as is your client. And these unique circumstances I think compel this Court to grant a mistrial and I so do at this time."

(Citations omitted). After reviewing the law, the court then concluded that Judge Cooper "did not abuse his discretion by granting a mistrial based on manifest necessity." "[T]he public's interest in a fair adjudication was implicated by the surprise absence of the State's witness."

Seay then filed this habeas petition in federal court under 28 U.S.C. § 2241. Magistrate Judge Mary Gordon Baker, in a careful analysis of the facts and the law, recommended that the petition be denied. Agreeing with the State that "there was manifest necessity for the mistrial," she explained that unlike the Supreme Court's case in *Downum*, the State in this case "did not take a chance." She stated further:

> [T]he State — and [Seay's] counsel — had been in contact with Ms. Grant the weekend before trial began, and nothing suggested she would not be present for trial; she had, in fact, testified during the trial of one of [Seay's] codefendants. After the jury was sworn, Ms. Grant stopped cooperating with the State and failed to appear, despite her subpoena. In response to the State's attempts to get in touch with her, she (or someone using her cellular telephone) sent a text message to the State's investigator advising that she was not coming to testify.

In response to Seay's contention that the trial judge should have granted a continuance instead of a mistrial, Magistrate Judge Baker disagreed:

> The trial judge did NOT order a mistrial immediately after the State advised him that Ms. Grant was not cooperating. Instead, Judge Cooper issued a bench warrant for Ms. Grant's arrest, and he sent the jury home for the rest of the day with instructions to return the following morning. The following day, when Ms. Grant still had not been located — even with the assistance of the United States Marshals Service — Judge Cooper granted a mistrial.

27

> When she was subsequently arrested — albeit a day later — she was found to be in contempt. And while she was arrested the following day, the information Judge Cooper had was that she was uncooperative and had decided she was not going to testify, no matter the consequences. There appears to have been no fault on behalf of the State (or the Petitioner) — Ms. Grant simply decided, at the eleventh hour, not to testify.

The judge accordingly recommended that the district court deny Seay's petition for a writ of habeas corpus.

After considering the case *de novo*, the district court agreed with Magistrate Judge Baker's recommendation. The court addressed more fully Seay's claim that the state judge failed to discuss and consider available alternatives prior to granting a mistrial, concluding that the state court did not abuse its discretion:

> While the trial judge did not seem to consider another continuance immediately before he granted the mistrial, in light of the circumstances, *i.e.* Grant's declaration that she did not want to testify, the State's effort's to locate her, including involving the U.S. Marshals' Office, and the fact that a continuance had already been granted, the court finds that no other alternatives were available at that time.

From the district court's order, dated September 11, 2018, Seay filed this appeal.

II

The applicable double jeopardy principles are not in controversy. The Fifth Amendment provides that "[n]o person shall be . . . subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const. amend. V. This Double Jeopardy Clause — which is applicable to the States through the Fourteenth Amendment, *see Benton v. Maryland*, 395 U.S. 784, 794 (1969) — thus "unequivocally prohibits a second trial following an acquittal." *Arizona v. Washington*, 434 U.S. 497, 503 (1978). But, as

28

jeopardy attaches on the empanelment of the jury, the Clause also protects "the defendant's 'valued right to have his trial completed by a particular tribunal.'" *Id.* (quoting *Wade v. Hunter*, 336 U.S. 684, 689 (1949)); *see also id.* at 503–04 (recognizing that, "whenever a trial is aborted before it is completed," there is a "danger of . . . unfairness to the defendant" because "[i]t increases the financial and emotional burden on the accused, prolongs the period in which he is stigmatized by an unresolved accusation of wrongdoing, and may even enhance the risk that an innocent defendant may be convicted" (footnote call numbers omitted)).  The Supreme Court has thus recognized that, "as a general rule, the prosecutor is entitled to one, and only one, opportunity to require an accused to stand trial." *Id.* at 505.

At the same time, however, the Court has recognized that a defendant's right to have a particular tribunal decide his case is not absolute and instead must "sometimes [be] subordinate to the public interest in affording the prosecutor one *full and fair* opportunity to present his evidence to an impartial jury." *Washington*, 434 U.S. at 505 (emphasis added).  Nonetheless, "in view of the importance of the right," the prosecutor bears the "heavy" burden of justifying any mistrial to which a defendant objects, and she does so by demonstrating that the mistrial is warranted by "'manifest necessity.'" *Id.* (quoting *United States v. Perez*, 22 U.S. (9 Wheat.) 579, 580 (1824) (recognizing that "the law has invested Courts of justice with the authority to discharge a jury from giving any verdict, whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated.  They are to exercise a sound discretion on the subject")); *cf. United States v.*

29

*Jorn*, 400 U.S. 470, 481 (1971) (plurality opinion) (describing "manifest necessity" as a "standard of appellate review for testing the trial judge's exercise of his discretion in declaring a mistrial without the defendant's consent"). But while this "classic formulation of the test" requires that there be "a 'high degree'" of necessity justifying a mistrial, the Court has nonetheless emphasized that *the standard must not "be applied mechanically"* but rather with "attention to the particular problem confronting the trial judge." *Washington*, 434 U.S. at 506 (emphasis added).

More specifically, as relevant here, the Court has instructed that "when the basis for the mistrial is the unavailability of critical prosecution evidence," "the strictest scrutiny is appropriate." *Washington*, 434 U.S. at 508. Such extra care must be taken because "the prohibition against double jeopardy as it evolved in this country was plainly intended to condemn [the] 'abhorrent' practice" of prosecutors seeking mistrials "in order to buttress weaknesses in [their] evidence," *id.* at 507–08, or otherwise attempting to use "the superior resources of the State to harass or to achieve a tactical advantage over the accused," *id.* at 508. As such, the Court has recognized that *if "a prosecutor proceeds to trial aware that [a] key witness[] [is] not available to give testimony* and a mistrial is later granted for that reason, a second prosecution is barred." *Id.* at 508 n.24 (emphasis added) (citing *Downum*, 372 U.S. 734). That being said, however, the Court has nonetheless repeatedly "refuse[d] to say that the absence of [a] witness[] 'can never justify discontinuance of a trial'" and has instead emphasized that "[e]ach case must turn on its facts." *Downum*, 372 U.S. at 737; *see also Wade*, 336 U.S. at 691 (same).

30

When a defendant contends that he may not be retried consistent with the Double Jeopardy Clause because the trial court's declaration of a mistrial was improper, "reviewing courts have an obligation to satisfy themselves that . . . the trial judge exercised 'sound discretion' in declaring a mistrial," so as to ensure that the defendant's right "to have his trial concluded before the first jury impaneled" is adequately protected. *Washington*, 434 U.S. at 514, 516. In considering whether a trial judge's exercise of discretion in granting a mistrial was sound, "a reviewing court may find relevant [1] whether the trial judge acted precipitately [in declaring a mistrial] or [instead] expressed concern regarding the possible double jeopardy consequences of an erroneous declaration of a mistrial, [2] heard extensive argument on the appropriateness of such a measure, and [3] gave appropriate consideration to alternatives less drastic than granting a mistrial." *Gilliam v. Foster*, 75 F.3d 881, 895 (4th Cir. 1996) (en banc); *see also Washington*, 434 U.S. at 515 (emphasizing, in concluding that a trial judge had exercised sound discretion in declaring a mistrial, that "[t]he trial judge did not act precipitately in response to the prosecutor's request for a mistrial" but instead had "evinc[ed] a concern for the possible double jeopardy consequences of an erroneous ruling" by giving "both defense counsel and the prosecutor full opportunity to explain their positions on the propriety of a mistrial"); *United States v. Shafer*, 987 F.2d 1054, 1057 (4th Cir. 1993) (noting that in determining whether a mistrial was required by manifest necessity, the question of "whether less drastic alternatives were available" is "critical" (citing *Harris v. Young*, 607 F.2d 1081, 1085 n.4 (4th Cir. 1979) ("If obvious and adequate alternatives to aborting the trial were disregarded, [it] suggests the trial judge acted unjustifiably")).

31

In this case, the record before the state trial judge at the time of his mistrial ruling fully supported his factual finding that "the State ha[d] been caught by surprise" by Grant's failure to appear on Wednesday, July 27. Indeed, because there was no evidence to the contrary, even the strictest scrutiny cannot justify upsetting the trial court's decision to discharge the jury. This was not an instance where the "prosecutor[s] [had] proceed[ed] to trial *aware* that [their] key witness[] [was] not available to give testimony" — a situation where the law is clear that the Double Jeopardy Clause would bar a second prosecution. *Washington*, 434 U.S. at 508 n.24 (emphasis added). Rather, after serving Grant with a subpoena the previous month, the prosecution team had met with her frequently, including on the Friday before the trial was scheduled to begin, and they had also spoken with her by phone that Saturday. She was a cooperating witness who was told to appear in court, pursuant to her subpoena, on Wednesday, July 27. The prosecutor thus had every reason to believe that Grant would testify as instructed the following week, just as she had in their prior trial against one of Seay's alleged coconspirators. Indeed, in later explaining her surprise to Judge Harrington, who found Grant in contempt, the prosecutor reiterated that Grant had "never indicated that she would not testify." At bottom, the record contains *no evidence* that the prosecution team *was aware* on the morning of Tuesday, July 26 — when the jury was empaneled — that Grant would refuse to testify the following day.

Without taking into account these important facts, the majority concludes that the prosecutor knew on the morning of July 26 that Grant might not appear when needed largely because she was not in court that morning or the morning before, July 25. It

32

focuses most heavily on the simple fact that the subpoena, issued one month before trial, states in one place that the witness had to appear every day of the entire trial. Elsewhere, however, the subpoena expressly provided that Grant could remain in compliance with the subpoena if she provided her contact information to the prosecutors (which we know she did) and came to court as directed by them. And the record here conclusively shows that the prosecutor did not require Grant to appear until Wednesday, July 27, at 9:00 a.m. State Trial Judge Cooper thus found that the prosecutor was surprised when, the night before her anticipated testimony, Grant declared that she would not appear on July 27 as required, and State Judge Harrington, who later held Grant in contempt, did so because she failed to appear *on Wednesday, July 27*. State Judge Dennis concluded likewise.

The majority, however, now overrules the facts found and conclusions reached by these state judges, summarizing its own finding as follows:

> Grant was compelled by subpoena to appear in court for the full term of court beginning on Monday, July 25, 2016, but she did not comply with that directive. Nor did Grant appear the following morning on Tuesday, July 26, 2016, before the jury was empaneled. . . . [T]he government [thus] *knew* that its crucial witness had failed to appear as required by subpoena for two consecutive days before the jury was empaneled . . . [but] nevertheless allowed jeopardy to attach, risking the foreseeable possibility that Grant would not appear in time to testify.

*Ante* at 9–10 (emphasis added). But this finding rests entirely on one statement in the subpoena that the majority takes out of context. When taken in context, it is clear that Grant was not required to appear, on the directive of the prosecutor, until Wednesday, July 27, after the jury had been empaneled. Consequently, no one expected Grant to appear in court on Monday, July 25 or Tuesday, July 26. And at the point when the jury

33

was empaneled, there is no evidence in the record that the prosecution proceeded with the awareness that Grant would not appear, as directed, the next day. To be sure, the record does indicate that at some point prior to *the morning of Wednesday, July 27*, the State's investigator had taken steps to try and locate Grant after she had temporarily stopped returning his phone calls and text messages. But there is no sound reason to infer from this that, contrary to her representation of surprise to the court, the prosecutor was actually aware *on the morning of Tuesday, July 26*, that Grant would not appear.

Thus, while the majority correctly points out that the Supreme Court in *Downum* "explained that the double jeopardy inquiry focuses on the state's *knowledge* at the time the jury is empaneled," *ante* at 8 (emphasis added), it wrongfully imputes to the prosecutor in this case a *knowledge and awareness* that the prosecutor did not have. The record demonstrates this factual error, showing that:

1) Grant was a cooperating witness who had already testified on behalf of the State against a codefendant involved in the same murder, leading to that defendant's conviction.

2) Grant met regularly with the prosecution, cooperating in the preparation for the trial of Seay.

3) At a trial preparation meeting in June 2016, prosecutors issued Grant a subpoena to appear for the week of July 25, and she expressed no reticence about responding to the subpoena as required.

4) The prosecution met with Grant on the Friday before trial and spoke with her by telephone on the Saturday before trial, giving the prosecution a firm belief that she would appear to testify at the trial the next week, when called.

5) Seay's counsel spoke with Grant on the Sunday before trial to introduce himself to her, and he did not dispute the prosecutor's statements.

34

6) Both the lead prosecutor and her investigator left telephone messages and texts with Grant, instructing her to appear for trial on Wednesday, July 27. While they did not reach her by telephone, she did receive their messages, as indicated by her return text during the night of July 26.

7) There was no evidence that when the jury was picked and empaneled on July 26, the prosecutor or defense counsel had any knowledge or awareness that Grant would not appear to testify on Wednesday, July 27. Indeed, the prosecutor later stated affirmatively that she had no such awareness, as Grant "never indicated she would not testify."

8) When Grant did not appear on July 27 as instructed, claiming fear of retribution, the prosecutor claimed surprise, noting that this was the first time such a situation had occurred in her 30-year career and in her investigator's 26-year career.

Thus, not only does the majority engage in factfinding — finding as fact that the prosecutor expected Grant to appear in court on both July 25 and July 26 and therefore *knew* that there was a real risk that she would not appear for trial — but its findings are not supported by the record. And this is especially troubling when the majority overrules the findings of three different state judges:

1) State Judge G. Thomas Cooper found that when Grant did not appear on Wednesday, July 27, "the State [was] caught by surprise" and found "no reason to believe that the State has concocted this factual situation." Moreover, in the bench warrant that the judge issued, he found that Grant "was advised by telephone communications to be present in [court] on Wednesday, July 27 . . . and willingly failed to appear."

2) State Judge Kristi L. Harrington found, in holding Grant in contempt of court, that Grant "failed to appear in court on July 27, 2016" and that she had "no justifiable defense for failing to appear in court on July 27, 2016."

3) State Judge R. Markley Dennis, Jr., in denying Seay's motion to dismiss the case against him based on double jeopardy, found that "[t]he State did not impanel a jury *with the knowledge* that they could not locate their witness nor with knowledge that the witness would refuse to cooperate due to being afraid." (Emphasis added).

35

With its unsupported factfinding and its ruling contrary to five judges — three state court judges and two federal judges — the majority engages in an aggressive and completely unnecessary intrusion into state proceedings, one that will deny South Carolina the right to prosecute Seay for first-degree murder.

Seay's reliance on *Downum* and *Cornero v. United States*, 48 F.2d 69 (9th Cir. 1931), provides him with little support in the circumstances of this case. The key to the Supreme Court's holding in *Downum* was that the prosecutor *knew* when he proceeded to empanel the jury that his witness had not been located before trial. Moreover, as the Court noted, the witness had not even been subpoenaed and "no other arrangements had been made to assure his presence." 372 U.S. at 737. In those circumstances, when the prosecutor empaneled the jury "without first ascertaining whether or not his witnesses were present, he took a chance," gambling on whether his witness would appear. *Id*. The facts in the present case, however, are materially different. The state prosecutor here had been in touch with the witness, who had cooperated in a prior case with respect to the same murder and who continued to cooperate in the prosecution of Seay. Moreover, the witness had been subpoenaed and had been directed to appear at the second day of trial, on Wednesday, July 27. The prosecutor thus did not take the chance described in *Downum*.

*Cornero*, which was cited with approval in *Downum*, is likewise distinguishable. That case involved a federal prosecution for a violation for the National Prohibition Act, where the government's case depended on the testimony of two codefendants who had

previously pleaded guilty. Rather than subpoena these witnesses, however, the district attorney relied on the fact that they had been "released under bond to appear for sentenc[ing] on the day of [Cornero's] trial." *Cornero*, 48 F.2d at 69. What is more, when the case was called for trial, the district attorney expressly noted that two of his three witnesses had failed to make an appearance but affirmatively suggested that the court empanel the jury and then allow him "a short time to ascertain [the location of] . . . the witnesses." *Id.* at 70. When the witnesses were still not located after several days and a mistrial was declared, the Ninth Circuit ruled that the Double Jeopardy Clause should have been applied to bar Cornero's second trial, reasoning that "when the district attorney impaneled the jury without first ascertaining whether or not his witnesses were present, he took a chance" that a mistrial would be necessary and that a later prosecution would be barred since he had "entered upon the trial of the case without sufficient evidence to convict." *Id.* at 71. Again, the circumstances before us are totally different, presenting none of the elements required to find that the prosecutor took a chance in this case.

In the larger picture, the majority's holding today unnecessarily challenges the traditional principles of comity and federalism that the Supreme Court has long required for our habeas review of state court proceedings. As the Supreme Court stated in *Williams v. Taylor*, "federal habeas corpus principles must inform and shape the historic and still vital relation of mutual respect and common purpose existing between States and the federal courts. In keeping this delicate balance we have been careful to limit the scope of federal intrusion into state criminal adjudications and to safeguard the States'

interest in the integrity of their criminal and collateral proceedings." 529 U.S. 420, 436 (2000); *see also Calderon v. Thompson*, 523 U.S. 538, 554 (1998) (concluding that "[a]lthough the terms of AEDPA do not govern this case," a court of appeals "must be guided by the general principles underlying our habeas jurisprudence").

In addition, with the majority's holding, criminal defendants who engage in witness intimidation on the eve of trial may now be able to avoid a trial altogether. Here, the State's theory of the case was that Seay and his coconspirators had murdered Lyles because they believed him to be a "snitch." Then, after the trial had begun, the State's key witness sent the prosecutor's investigator a message that she would not be appearing to testify because she was "scared as hell" and would rather face jail time than risk "leaving my son in this world without a mother." While the State later candidly conceded that it had "no information that [Grant] was threatened by the defendant or anybody on his behalf," at the time that the state trial judge was deciding how to proceed, it was far from clear what had transpired, and it seemed entirely possible that Grant had been threatened by someone associated with Seay or even Seay himself, as he was out on bond at the time. Indeed, as a precaution, the trial court temporarily revoked Seay's bond on July 27. In these circumstances, "unless unscrupulous [defendants] are to be allowed an unfair advantage, the trial judge must have the power to declare a mistrial." *Washington*, 434 U.S. at 513.

## III

Seay also contends that the state trial judge acted "precipitately" in ordering a mistrial and failed to consider adequately whether there were reasonable alternatives to a mistrial. The majority concludes similarly, noting that the trial court "did not discuss why it did not continue the trial one additional day, or over the weekend until the following Monday, August 1, 2016, to give law enforcement authorities additional time to locate Grant." *Ante* at 14–15. These arguments, however, fail to credit the actions that the trial judge actually took and the context in which he made his ruling.

The record shows that when, on Wednesday, July 27, the State expressed surprise by Grant's failure to appear, the state court did not precipitately grant a mistrial. Instead, it took two other actions. First, it issued a bench warrant, directing law enforcement officers to arrest Grant and bring her into the courtroom to testify. And second, it granted a postponement of the trial until the next day to give the officers an opportunity to find Grant. In addition, on the next day, when law enforcement officers reported that they were unable to find Grant, the court also took into account the fact that Grant had texted the prosecutor's investigator, telling him that she was not going to testify, *regardless of the consequences*, because she was "scared as hell" and had concluded that "[j]ail time [for not appearing] [was] better than leaving [her] son in this world without a mother." Finally, the court conducted a hearing, receiving the arguments of both parties. In these circumstances, the record does not reflect that the trial judge "act[ed] precipitately in response to the prosecutor's request for mistrial." *Washington*, 434 U.S. at 515. Instead, like in *Washington*, the court was clearly aware of "the possible double jeopardy

39

consequences of an erroneous ruling" and "gave both defense counsel and the prosecutor a full opportunity to explain their positions on the propriety of a mistrial." *Id*. at 515–16; *cf. Jorn*, 400 U.S. at 487 (plurality opinion) (emphasizing, in holding that a defendant's reprosecution would violate the Double Jeopardy Clause, that "the trial judge acted so abruptly" in *sua sponte* declaring a mistrial that neither defense counsel nor the prosecutor had any opportunity to object or suggest an alternative).

Thus, when the court considered the mistrial motion, it had already granted a 24-hour continuance to search for Grant to no avail, and there was no reason to believe at that time that Grant would be located any time soon were an additional continuance granted. Seay nonetheless argues that the trial judge could have required the State to present its remaining witnesses while the search for Grant continued. But the record reflects that the State at that point had only three or four witnesses left whom it had planned to call and that those witnesses' testimony was useful only to corroborate Grant's testimony.

> Considering these factors, the district court rejected Seay's argument, stating:

> While the trial judge did not seem to consider another continuance immediately before he granted the mistrial, in light of the circumstances, *i.e.* Grant's declaration that she did not want to testify, the State's effort's to locate her, including involving the U.S. Marshals' Office, and the fact that a continuance had already been granted, the court finds that no other alternatives were available at that time. . . . As a continuance had already been granted and substantial efforts were already made to locate the absent witness without success, the court defers to the trial judge's ruling that manifest necessity warranted a mistrial.

I agree.

IV

South Carolina has probable cause to believe that Broderick Seay, Jr. committed a first-degree murder, execution-style, of a man thought to be a "snitch," and it wants only to have one full and fair opportunity to convict him for the crime and remove him from society. This case does not present any question of prosecutorial abuse, prosecutorial misconduct, or prejudice to the defendant — matters that the Double Jeopardy Clause was designed to forestall. And the majority's incautious application of the Clause in the circumstances presented is, I believe, a tragedy for public justice. The State is being denied a fair opportunity to try a person indicted by a grand jury for murder, and the public interest strongly requires us to act most cautiously. The entire purpose of the Double Jeopardy Clause is to protect defendants from prosecutorial abuse and multiple trials for the same offense. But it should rarely be applied to deny the State one full trial where, as here, the prosecutor and the trial judge acted reasonably under all the circumstances.

Accordingly, I would affirm the judgment of the district court, which denied Seay's petition for a writ of habeas corpus, and allow his retrial in state court for murder.