UNITED STATES of America,
Plaintiff–Appellee,

v.

Scott Dunbar SHAFER, Defendant–
Appellant.

No. 91–5774.

United States Court of Appeals,
Fourth Circuit.

Argued Oct. 29, 1992.

Decided Feb. 23, 1993.

Sean Patrick Devereux, Whaley, Hay, Pitts, Hugenschmidt, Master, Devereux & Belser, P.A., Asheville, NC, for defendant-appellant.

Frank D. Whitney, Office of the U.S. Atty., Charlotte, NC, argued (Thomas J. Ashcraft, U.S. Atty., Gretchen C.F. Shappert, Asst. U.S. Atty., on brief), for plaintiff-appellee.

Before RUSSELL, HALL, and WILLIAMS, Circuit Judges.

## OPINION

K.K. HALL, Circuit Judge:

Scott Dunbar Shafer conditionally pleaded guilty to mail fraud in violation of 18 U.S.C. § 1341. The plea preserved his right to appeal the district court's decision to declare a mistrial over his objection. We conclude that there was no "manifest necessity" for the mistrial and reverse.

### I.

Shafer owned Seeker Lure Company ("Seeker"), a small manufacturer of plastic fishing worms located in Hendersonville, North Carolina. On February 21, 1985, the building occupied by Seeker burned to the ground. Shafer received an insurance settlement for the building's contents.

On February 9, 1990, twelve days before the statute of limitations would have run, a grand jury indicted Shafer on one count of arson, 18 U.S.C. § 844(i), and one count of mail fraud, 18 U.S.C. § 1341.

On March 1, 1990, Shafer filed a request for exculpatory evidence pursuant to *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). On March 16, 1990, the United States Magistrate entered an order requiring that:

[T]he Government disclose to defense counsel all *Brady* material which is in the possession, custody or control of the government, the existence of which is known, *or by due diligence should become known,* to the attorney for the government. Disclosure under this paragraph will include the following:

> .  .  .  .  .

B. evidence or information ... which tends to exculpate the accused;

> .  .  .  .  .

D. evidence or information tending to discredit or impeach the credibility of a government witness,.... Impeaching as well as exculpatory evidence is favorable to the accused under *Brady.*

(emphasis supplied; citations omitted). The order further specified that the discovery materials were to be provided "no later than *ONE WEEK* prior to trial[.]" (emphasis in original). On March 20, 1990, government and defense counsel entered into an "open file" agreement. On March 4, 1991, the government provided defense counsel with what it claimed were all *Jencks*[1] and *Brady* materials.

The jury was empaneled on March 5, 1991. The government's opening statement told the jury that the evidence would prove that Shafer burned his place of business because Seeker was failing financially. The government, in its case-in-chief, delivered on its promise to show that Seeker Lure was failing financially. As later events would demonstrate, however, it did so through false or misleading testimony.

Terry Lee Gimer, an employee of C & L Plastics, one of Seeker's suppliers, testified that Seeker had never purchased more than $5,000 of worms in a month and that its total purchases from C & L in 1984 and 1985 were only $14,000. She also intimated that Seeker would not have had alternative sources of supply of certain types of worms.

Marvin Culp, another supplier, testified that Seeker curtailed its orders in 1984 and only ordered one small shipment in the "early part" of 1985. Although Culp could not at first remember how small the shipment actually was, after the government "refreshed" his memory, he agreed that it was "next to nothing," and that he had informed the investigators the small order might indicate sales problems. Culp also testified that, to the best of his knowledge, Seeker had shifted its orders to C & L. When this testimony was combined with

---

1. Under Fed.R.Crim.P. 26.2 and 18 U.S.C. § 3500 (the Jencks Act) the prosecution is required to produce the prior statements of prosecution witnesses.

Gimer's statement that Seeker's total purchases of worms from C & L for 1984 and 1985 was only $14,000, it created the impression that Seeker was in serious financial trouble.

On redirect, the government emphasized the significance of Shafer's curtailment of orders immediately prior to the "heart of the worm season" and again elicited Culp's opinion that this action indicated sales problems.[2]

## A. *The missing documents.*

As the government's case unfolded, Shafer's lawyer complained that the discovery materials produced on March 4, 1991, contained an internal reference to an unproduced videotape of the fire scene. The court heard evidence on this matter, determined that the tape was lost, and ruled that the trial should continue in its absence.

On March 12, still seeking the tape, Shafer's lawyers served a *subpoena duces tecum* on Captain John Nicholson, who was in charge of the Hendersonville Police Department's property room. Nicholson could not find the tape, but he did bring a cart that was four feet long and stacked two to three feet high with Seeker's financial records—records that had never been disclosed to Shafer's lawyers.

These records had been collected from the fire scene and stored for over six years in the Hendersonville Police Department. At some point, the records became misplaced or forgotten. Significantly, Steve Reed, a State Bureau of Investigations Agent who built the Shafer case file for the U.S. Attorney's office, was the very person who seized the records from the alleged arson scene. Reed had been aware for several weeks before the trial that the records had been misplaced, a fact that he neglected to share with the district court,

the U.S. Attorney's Office, or Shafer's lawyers.

On March 13, 1991, the government stipulated that the evidence contained *Brady* material. This stipulation is an understatement—the documents destroy the testimony of Gimer and Culp, the witnesses used to demonstrate Seeker's supposedly failing financial condition. Gimer was impeached: the documents indicated that Seeker paid C & L $10,000 in the month before the fire. Culp was similarly impeached: the documents contained letters from Shafer to Culp indicating that Seeker was planning to purchase $50,000 of one type of grub worm and $18,000 of another. Other documents demonstrated that Seeker had alternative supply sources for worms.

The district court ruled that the government had failed to produce a large quantity of discovery materials, including the financial documents.[3] The court determined that the government was at fault for the discovery violations, because Agent Reed "did know or should have known" that the evidence existed.

## B. *The district court declares a mistrial.*

Sensing the kill, Shafer's lawyers moved for a dismissal with prejudice. The government responded by blaming the Hendersonville Police Department. The court denied the dismissal motion, but considered granting a continuance to allow the defense to study the new materials. However, the court then determined that the proceedings were "tainted" by the Government's failure to turn over the discovery materials and, over Shafer's objection, declared a mistrial *sua sponte.*

Shafer then conditionally pleaded guilty to the mail fraud count in exchange for a dismissal of the arson count. The plea agreement expressly reserved Shafer's

---

2. According to Culp, the "heart of the worm season" is from the second week of January "all the way through to September" with April, May, and June constituting the three biggest months.

3. These materials included: (1) the Hendersonville Police Department's investigative file; (2) a 10-inch stack of documents provided to the

defense during trial; (3) various boxes of material made available to the grand jury; (4) the cart filled with source documents relating to Seeker's financial condition; and (5) an audio cassette shown on the Hendersonville Police Department's records, that could not be located.

right to appeal the mistrial. Shafer was given a one year suspended sentence and one year of probation; he appeals.

## II

■ In a jury trial, jeopardy attaches when the jury is empaneled; from that point forward, the defendant has a constitutional right,[4] subject to limited exceptions, to have his case decided by that particular jury. *Crist v. Bretz,* 437 U.S. 28, 36, 98 S.Ct. 2156, 2161, 57 L.Ed.2d 24 (1978); *United States v. Jorn,* 400 U.S. 470, 479–80, 91 S.Ct. 547, 554, 27 L.Ed.2d 543 (1971); *Harris v. Young,* 607 F.2d 1081, 1086 (4th Cir.1979) (similar right in a bench trial). In narrow circumstances, this right may be subordinated "to the public's interest in fair trials designed to end in just judgments." *Wade v. Hunter,* 336 U.S. 684, 689, 69 S.Ct. 834, 837, 93 L.Ed. 974 (1949); *United States v. Perez,* 22 U.S. (9 Wheat.) 579, 580, 6 L.Ed. 165 (1824).

■ The Supreme Court has reconciled the potential conflict between the defendant's and the public's rights, by ruling that a mistrial may be granted over the defendant's objection only when required by "manifest necessity."[5] *Arizona v. Washington,* 434 U.S. 497, 505, 98 S.Ct. 824, 830, 54 L.Ed.2d 717 (1978); *Perez,* 22 U.S. (9 Wheat.) at 579–80. We conclude that this mistrial was not required by manifest necessity. First, there were available alternatives that would have alleviated the

prejudice to Shafer and allowed the trial to continue. Second, the district court's decision to declare the mistrial was at least partially based upon its recognition that the government's case was weakened by the newly discovered materials.

### A. *Available alternatives.*

■ In order to determine if the mistrial was required by manifest necessity, the critical inquiry is whether less drastic alternatives were available. *Harris v. Young,* 607 F.2d at 1085 n. 4 ("If obvious and adequate alternatives to aborting the trial were disregarded, this suggests the trial judge acted unjustifiably."). If alternatives existed, then society's interest in "fair trials designed to end in just judgments," *Perez,* 22 U.S. (9 Wheat.) at 579–80, was not in conflict with the defendant's right to have the case submitted to the jury. We believe that this inquiry is particularly relevant where, as here, the mistrial is ordered solely because of the prosecution's gross negligence.[6]

■ The district court declared the mistrial because the jury was "tainted," both sides had been hampered in their witness preparation, and the defendant's cross-examination of Gimer and Culp would have been different and more meaningful if he had possessed the financial records. The court briefly explored several alternatives, such as recalling the witnesses and allowing renewed cross-examination, but deter-

---

**4.** The Double Jeopardy Clause provides that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb[.]" U.S. Const. amend. V. The policy behind the clause is the recognition that:

the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty.

*Green v. United States,* 355 U.S. 184, 187–88, 78 S.Ct. 221, 223, 2 L.Ed.2d 199 (1957).

**5.** Although *Perez* was decided almost 170 years ago, its "manifest necessity" standard remains ill-defined. *See United States v. Jorn,* 400 U.S. 470, 480, 91 S.Ct. 547, 554, 27 L.Ed.2d 543

(1971) (plurality op.) (Court refuses to formulate rules establishing categories of circumstances that will permit or preclude a retrial); Reiss, *Prosecutorial Intent in Constitutional Criminal Procedure,* 135 U.Pa.L.Rev. 1365, 1424 (1987) (The Supreme Court's "decisions provide notably little guidance as to what constitutes 'manifest necessity.' ") (footnotes omitted). Accordingly, the finding of manifest necessity must be reviewed in light of the facts presented in each case. *See United States v. Sartori,* 730 F.2d 973, 975 (4th Cir.1984) (manifest necessity cannot be applied in a mechanical fashion).

**6.** In *Jorn,* the Court stressed that an "important factor" in reviewing the district court's decision was the "need to hold litigants on both sides to standards of professional conduct in the clash of the adversary criminal process." *Jorn,* 400 U.S. at 486, 91 S.Ct. at 557.

mined that the alternatives would not correct or relieve the "taint." [7] We review the district court's decision for abuse of discretion. *Harris*, 607 F.2d at 1085.

As an initial matter, we must put aside any statements by the district court that the mistrial was partially motivated by concerns of prejudice to the defense. *Whitfield v. Warden of Md. House of Correction*, 486 F.2d 1118, 1122–23 (4th Cir.1973), *relying on Jorn*, 400 U.S. at 483, 91 S.Ct. at 556. We note that such reservations were not shared by Shafer, who wanted the trial to continue. As we explain below, the late disclosure probably acted in his favor.

█ We conclude that the district court abused its discretion because there were several alternatives that would have protected both Shafer's right to cross-examine the government's witnesses and his right to submit the case to the jury. First, a brief continuance would have allowed Shafer's attorneys to study the material before the trial continued. Second, the court could have inquired into Shafer's willingness to waive the prejudice he may have suffered from these late disclosures and continue the trial.[8] The record is replete with indications that Shafer was willing to do so. Third, the government's witnesses could have been recalled for additional cross-examination. As we will discuss in the following section, their inevitable impeachment by the wrongfully withheld evidence is not a permissible reason to end the trial. Fourth, the court could have allowed Shafer to introduce the new evidence as part of his case-in-chief. Finally, in order to eliminate the confusion of issues, the court could have precluded Shafer's attorneys from mentioning the government's failure to produce.

In short, there were ample alternatives that would have accommodated Shafer's desire to exercise his constitutional right to submit the case to the jury. Therefore, we conclude that the district court abused its discretion by not allowing Shafer an opportunity to accept these alternatives.

Even when judicial or prosecutorial error prejudices a defendant's prospects of securing an acquittal, he may nonetheless desire "to go to the first jury and, perhaps, end the dispute then and there with an acquittal."

. . . . .

The important consideration, for purposes of the Double Jeopardy Clause, is that the defendant retain primary control over the course to be followed in the event of [prosecutorial or judicial] error. *United States v. Dinitz*, 424 U.S. 600, 608–09, 96 S.Ct. 1075, 1080, 47 L.Ed.2d 267 (1976) (citations and footnotes omitted).

**B.** *Improper motives for the mistrial.*

█ The Double Jeopardy Clause strictly forbids the district court from granting a mistrial to allow the prosecution to strengthen its case. *Downum v. United States*, 372 U.S. 734, 736, 83 S.Ct. 1033, 1034, 10 L.Ed.2d 100 (1963); *Whitfield*, 486 F.2d at 1123 ("[R]eprosecution is barred if the purpose of the trial judge's declaration of a mistrial is to ... assist the government."); *United States v. DiFrancesco*, 449 U.S. 117, 128, 101 S.Ct. 426, 432, 66 L.Ed.2d 328 (1980) (" 'Central to the objective of the prohibition against successive trials' is the barrier to 'affording the prosecution another opportunity to supply evidence which it failed to muster in the first proceeding.' ") (quoting *Burks v. United States*, 437 U.S. 1, 11, 98 S.Ct. 2141, 2147, 57 L.Ed.2d 1 (1978)).

Although the district court's primary stated purpose for granting the mistrial was that the jury was "tainted," the court also stated that, in its opinion, the discovery violations had hurt the government's case. For example, the district court stated that, if the evidence had been promptly

---

**7.** Although the district court did not make an explicit finding of "manifest necessity," such a finding is not required if the reviewing court can determine that manifest necessity was present. *Harris*, 607 F.2d at 1085 n. 4.

**8.** We note that this case did not involve noncurable error. *See Illinois v. Somerville*, 410 U.S. 458, 468–69, 93 S.Ct. 1066, 1072, 35 L.Ed.2d 425 (1973) (early mistrial over the defendant's objection was justified when an indictment was fatally flawed and not amendable under state law, thus assuring future reversal).

discovered, "Government witnesses might have had a different approach. Certainly, the financial experts, who have yet to testify, would be [affected] by this evidence" and that "even the Government's direct testimony may have been *hampered or affected by [its] lack of access* to some of this new found material." (emphasis supplied).

■ We agree with the district court that the government's case was damaged by its failure to timely provide Shafer the *Brady* material that he was entitled to receive.[9] However, this self-inflicted injury cannot be used to afford the government a second chance to prosecute so that it may argue a recast theory of the case better supported by the evidence. "[A]s a general rule, the prosecutor is entitled to one, and only one, opportunity to require an accused to stand trial." *Arizona v. Washington*, 434 U.S. 497, 505, 98 S.Ct. 824, 830, 54 L.Ed.2d 717 (1978).

### III.

Because we conclude that the district court ignored available alternatives and that its motivation for declaring the mistrial was partially to rescue the government from a sinking case, we conclude that Shafer's conviction must be reversed. A contrary holding would allow the government's violation of one constitutional right to strip the defendant of another valuable right. The proper course of action was for the district court to dismiss the case with prejudice or to let the government take its medicine on cross-examination.

The government's actions in this case were inexcusable. Prosecuting federal felonies is a serious undertaking with potentially devastating consequences for the accused. The government had six years to prepare this case, yet was unable to locate and assemble exculpatory evidence that the defense uncovered with one subpoena. Clearly, the mid-trial "discovery" of substantial exculpatory evidence contradicting the government's theory of the case did not

constitute manifest necessity justifying a mistrial over the defendant's objection.

The district court's decision to grant a mistrial over Shafer's objection violated the Double Jeopardy Clause; therefore, the conviction is reversed.

REVERSED.

---

**9.** Once the evidence was "discovered," Shafer was in a position to argue that the government was guilty of sloppy police work, to rebut the allegations that Seeker Lure was in dire financial straits, and to impeach government witnesses who had made misstatements of fact.