IN THE COURT OF APPEALS OF NORTH CAROLINA

2021-NCCOA-6

No. COA COA19-1140

Filed: 2 February 2021

Bertie County, Nos. 16 CRS 120, 50352

STATE OF NORTH CAROLINA

v.

MARQUES D. GRAYS

Appeal by Defendant from an Order entered 21 May 2019 and Judgment entered 30 May 2019 by Judge Marvin K. Blount, III, in Bertie County Superior Court. Heard in the Court of Appeals 17 November 2020.

*Attorney General Joshua H. Stein, by Assistant Attorney General Kristin J. Uicker, for the State.*

*Appellate Defender Glenn Gerding, by Assistant Appellate Defender Wyatt Orsbon, for defendant-appellant.*

HAMPSON, Judge.

## **Factual and Procedural Background**

¶ 1       Marques D. Grays (Defendant) appeals from a Judgment entered upon a jury verdict convicting him of Felony Possession of a Weapon by a Prisoner in Bertie County file number 16 CRS 120. In addition, Defendant appeals from an Order denying his Motion to Dismiss a charge of First-Degree Murder in 16 CRS 50352 on which the jury deadlocked, resulting in the trial court ordering a mistrial. On 19

February 2020, this Court granted Defendant's Petition for Writ of Certiorari to review the Order entered in 16 CRS 50352. This Court also consolidated the two appeals and issued a writ of supersedeas to stay any further trial proceedings pending appeal. Both appeals involve the same question of whether each of Defendant's trials violated his rights under the State and Federal Constitutions to be free from double jeopardy. The Record before us reflects the following:

¶ 2       On 1 August 2016, a Bertie County Grand Jury indicted Defendant on charges of First-Degree Murder (16 CRS 50352) and Possession of a Weapon by a Prisoner (16 CRS 120). Defendant's case first came for trial on 6 August 2018 in Bertie County Superior Court, Judge Cy A. Grant presiding. A jury was selected and impaneled on that day. During opening statements, the State explained the evidence would show on 10 June 2016, Defendant—a prisoner at the Bertie Correctional Institution— approached Joleski Floyd (Floyd) who was "hanging out with friends" watching television in a prison common area. Then, according to the State, the two men "exchanged words" and fought in a "back cell." Defendant walked out of the cell "bloody and visibly injured" a few moments later. According to the State, Defendant went to his cell and returned to the common area two hours later. Defendant then struck Floyd "twice in the head with an ice pick shaped weapon." Correctional officers apprehended Defendant. Floyd later died of his wounds.

¶ 3         The State began its case-in-chief by calling Demetrius Clark (Clark), the prison's assistant superintendent.  After Clark testified, court was adjourned for the day.  The next morning, the State announced it had received "evidence that had not been turned over from the prison."  The State moved for a mistrial asserting this new evidence was "vital information that need[ed] to be tested."  The State continued it "had no indication . . . about this evidence" and only learned of its existence when Clark mentioned it while discussing his testimony with the prosecutor after court had adjourned the day prior.  When Judge Grant asked what the evidence was, the prosecutor replied: "It is the bloody clothes that came from the defendant."  Judge Grant then asked: "[W]hen was this discovered?"  The prosecutor responded: "Yeah. Well, Your Honor, I -- what I can say for certain is that it was collected at the prison, it was kept at the prison."

¶ 4         The State described how law enforcement went to the prison to collect "whatever evidence" the prison had from the incident.  According to the State, prison officials gave law enforcement "two shanks" but "never notified" law enforcement about the clothing.  Judge Grant asked: "Why wasn't this stuff turned over?  It just seems so obvious."  Judge Grant continued: "I'm going to tell you Mr. Superintendent there, it's ridiculous.  You know, it borders on incompetence . . . that this wasn't turned over to law enforcement."  The prosecutor stated: "I want to put on the evidence to protect the integrity of the case as well as the State[.]"

¶ 5        Defense counsel objected "to a mistrial being granted in this case."  Defense counsel further questioned whether the evidence was what the State said it was and expressed concern the evidence was not "maintained or kept in a manner that would be appropriate for purposes of trial or for evidence."

¶ 6        The prosecutor responded stating: "Your Honor, and frankly, that is part of the reason that we need a mistrial.  We have no -- I don't know if this evidence is inculpatory, exculpatory, or irrelevant."  Judge Grant expressed concern in granting a mistrial "once the jury has been impaneled" and when "there is newly discovered evidence by the State and the State asked for the mistrial[.]"  Judge Grant added, "I mean, I would have no problems if [Defense Counsel] asked for a mistrial based upon this.  But you have the State asking for a mistrial because they discovered new evidence that is helpful to their case."  Judge Grant recessed court asking the parties to research "the law with regard to granting a mistrial for newly discovered evidence based on a motion for a mistrial by the State[.]"

¶ 7        When the trial resumed, the State again moved for a mistrial "under [N.C. Gen. Stat. §] 15A-1063" because it was "impossible for the State -- for the trial to proceed in conformity of the law" and there was "no reasonable probability of the jury's agreement upon a verdict."  Defendant renewed his objection to a mistrial.

¶ 8        Judge Grant asked the State why it would be unfair to proceed with the trial. The State responded Defendant would have an ineffective assistance of counsel (IAC)

claim on appeal if Defendant was found guilty without testing this evidence. Defense counsel addressed the potential IAC claim stating: "no matter what . . . comes back" from testing, the results would be "beneficial to the State." Defense counsel continued "[the prosecutor has] not indicated that if it does turn out it's not Joleski Floyd's blood, then she will get rid of the case." Judge Grant agreed saying, "I don't put much stock in [the State's] argument on behalf of the defendant . . . common sense dictates" the State wanted the clothes tested because it would help the State's case against Defendant. Judge Grant ordered a hearing including testimony from Clark and two law enforcement officers regarding the discovery of the clothes at the prison and why the evidence was not disclosed before trial.

¶ 9       After the hearing, Judge Grant again asked the State why a mistrial was necessary. The State argued the evidence was "very significant" because, if DNA testing confirmed the alleged blood on the clothing was Defendant's, the evidence would corroborate witnesses who would testify they saw Defendant come "out of his room bleeding[.]" Judge Grant clarified this evidence, if admitted, would only corroborate witness testimony as to what witnesses saw during the first alleged fight between Defendant and Floyd. Defense counsel argued the discovery of the evidence did not justify a mistrial and that the putative evidence be excluded and the trial proceed.

¶ 10    As to the evidence's potentially exculpatory nature, Judge Grant again stated: "I have a really hard time thinking that you're making this argument thinking about what might be exculpatory for the defendant. . . .[Defendant's] own lawyers are not making that argument." Moreover, Judge Grant noted the evidence "wouldn't be exculpatory because you wouldn't even know when the blood got up there. . . . Even if it comes in, there's no indication when the blood got on the defendant's clothes."

¶ 11    After considering the testimony and arguments—and expressing disbelief at the prison's inability to notify law enforcement of the clothing and law enforcement's inability to ask for any clothing based on their own investigatory experience—Judge Grant concluded: "All right. . . . I'll grant the mistrial. I'll have to find some facts to support the conclusion." In his written Order granting a mistrial, Judge Grant made the following relevant Findings of Fact:

> 6. Mr. Clark testified at the hearing on August 7, 2018 that on Monday evening after the court recessed that he informed the prosecutor and the lead SBI agent Mr. Steven Stile that there were articles of clothing belonging to the defendant and the victim Joleski Floyd at the prison which had not been collected by law enforcement officers.
>
> 7. Mr. Clark was directed by SBI Agent Steven Stile to go to the prison and locate the clothing.
>
> 8. Mr. Clark went to the prison and located articles of clothing belonging to the defendant and the victim.
>
> 9. The articles of clothing belonging to the defendant were found in a contraband locker inside a paper bag.

10. The paper bag had the defendant's name hand-written on the bag identifying the clothing as belonging to the defendant.

11. At the hearing[,] the bag of clothing purportedly belonging to the defendant was introduced as Defendant's Exhibit Number 2.

12. A pair of pants and a T-shirt[,] among other items of clothing[,] were removed from Defendant's Exhibit Number 2, which appeared to have bloodstains.

13. Mr. Clark testified he believes that the clothing in Defendant's Exhibit Number 2 were clothes found in the defendant's prison cell after an alleged second altercation between the defendant and the victim.

14. Mr. Clark testified that it is his belief that defendant was not permitted to return to his prison cell following the second altercation.

15. Mr. Clark testified that in his opinion the clothing found in the defendant's prison cell was not clothing worn by the defendant at the time of the alleged second altercation with the victim.

16. The prosecutor argues to the Court that the State would call as a witness, an inmate, who would testify that there was an altercation between the defendant and the victim, which occurred approximately two hours before the altercation which resulted in the victim's death.

17. And that the prison inmate would testify that he saw the defendant immediately following the first alleged altercation bleeding from his head area and he saw the defendant wipe blood from his wound into his clothing.

18. The prosecutor further argues that the stain seen on the defendant's clothing on Defendant's Exhibit Number 2 should be sent to the state's crime lab for testing to determine, one, if the stains are, in fact, blood, and, two, whose blood is it.

19. The prosecution further argues that if it is determined to be the defendant's blood[,] that fact would corroborate the prison inmate's testimony that the defendant wiped blood from his wound onto his clothing following the first altercation.

20. The prosecutor also argues that if the stains on the clothing are determined to be blood belonging to someone other than the defendant or the victim[,] it could be exculpatory to the defense.

Based on these Findings, Judge Grant concluded "as a Matter of Law that it is in the public's interest in a fair trial to enter an order of mistrial and have this trial continued to allow time for the State Bureau of Investigation to test" the clothing.

¶ 12 Defendant's case came on for a second trial on 20 May 2019, Judge Marvin K. Blount, III, presiding. Before jury selection, Judge Blount considered Defendant's pretrial Motion in Limine seeking to exclude the evidence on which the previous trial court based its Order for mistrial. The State consented to Defendant's Motion in Limine because the State was "not intending on introducing that evidence." Judge Blount also considered Defendant's pretrial Motion to Dismiss both charges on double jeopardy grounds. On 21 May 2019, after hearing arguments from the parties, Judge Blount orally denied Defendant's Motion to Dismiss and this order was entered. *See State v. Miller*, 368 N.C. 729, 738, 783 S.E.2d 194, 200 (2016) ("a trial court has entered a judgment or order in a criminal case in the event that it announces its ruling in open court and the courtroom clerk makes a notation of its ruling in the

minutes being kept for that session."). Defendant objected to Judge Blount's ruling and gave oral Notice of Appeal in open court.

¶ 13     The second trial continued. At the close of the State's evidence and, again, at the close of all the evidence, Defendant renewed his Motion to Dismiss—Judge Blount denied each Motion. The second jury convicted Defendant of Possession of a Weapon by a Prisoner but deadlocked on the First-Degree Murder charge. As a result of the hung jury, Judge Blount declared another mistrial on the First-Degree Murder charge and retained the case for a third trial. After Judge Blount entered Judgment on the charge of Possession of a Weapon by a Prisoner, Defendant gave oral Notice of Appeal.

¶ 14     As Defendant's First-Degree Murder charge remained pending for a third trial—rendering his appeal of Judge Blount's denial of his Motion to Dismiss interlocutory—Defendant filed a Petition for a Writ of Certiorari to review the denial and a Petition for a Writ of Supersedeas and Motion for a Stay of Proceedings in the third First-Degree Murder trial. In a 19 February 2019 Order, we granted Defendant's Petitions and Motions, and consolidated that appeal with Defendant's direct appeal of the Judgment upon his conviction of Possession of a Weapon by a Prisoner.

## **Issue**

¶ 15        The dispositive issue in both appeals is whether the trial court erred in denying Defendant's Motion to Dismiss on the grounds double jeopardy barred Defendant's second trial after the trial court granted a mistrial in the first trial on the basis of the allegedly corroborative evidence belatedly found by the State.

## **Standard of Review**

¶ 16        We review double jeopardy issues de novo. *State v. Sparks*, 362 N.C. 181, 185-86, 657 S.E.2d 655, 658 (2008); *see State v. Newman*, 186 N.C. App. 382, 386, 651 S.E.2d 584, 587 (2007) ("The standard of review for [double jeopardy issues] is de novo, as the trial court made a legal conclusion regarding the defendant's exposure to double jeopardy." (citation omitted)).  "Under a de novo review, the court considers the matter anew and freely substitutes its own judgment for that of the lower tribunal."  *State v. Williams*, 362 N.C. 628, 632-33, 669 S.E.2d 290, 294 (2008) (citation and quotation marks omitted).

## **Analysis**

¶ 17        "It is a fundamental principle of the common law, guaranteed by our Federal and State Constitutions, that no person may be twice put in jeopardy of life or limb for the same offense." *State v. Shuler*, 293 N.C. 34, 42, 235 S.E.2d 226, 231 (1977) (citations omitted); *see* U.S. Const. amend. V; N.C. Const. art. I, § 19.  Under the Double Jeopardy Clause of the Fifth Amendment, "once a defendant is placed in jeopardy for an offense, and jeopardy terminates with respect to that offense, the

defendant may [not] be tried . . . a second time for the same offense." *Sattazahn v. Pennsylvania*, 537 U.S. 101, 106, 154 L. Ed. 2d 588, 595 (2003) (citation omitted). "In a criminal prosecution, jeopardy attaches when a jury is impaneled to try a defendant on a valid bill of indictment." *State v. Schalow*, 251 N.C. App. 334, 343, 795 S.E.2d 567, 574 (citations omitted).

¶ 18        Ordinarily, "an order of mistrial in a criminal case will not support a plea of former jeopardy." *State v. Battle*, 279 N.C. 484, 486, 183 S.E.2d 641, 643 (1971) (citation omitted). However, "where the order of mistrial has been improperly entered over a defendant's objection, defendant's motion for dismissal at a subsequent trial on the same charges *must* be granted." *State v. Odom*, 316 N.C. 306, 310, 341 S.E.2d 332, 334 (emphasis added) (citations omitted).

¶ 19        "There must be a showing of 'manifest necessity' for an order of mistrial over defendant's objection to be proper." *Id.* (citation omitted); *see State v. Chriscoe*, 87 N.C. App. 404, 407-08, 360 S.E.2d 812, 814 (1987) (analyzing a trial court's declaration of mistrial under N.C. Gen. Stat. § 15A-1063(1)—which allows a trial court to declare a mistrial "if it is impossible for the trial to proceed in conformity with the law"—according to our "manifest necessity" principles). "Although this requirement does not describe a standard that can be applied mechanically, it does establish that the prosecutor's burden is a heavy one." *Chriscoe*, 87 N.C. App. at 407, 360 S.E.2d at 814 (alteration, citation, and quotation marks omitted); *see State v.*

*Cooley*, 47 N.C. App. 376, 384, 268 S.E.2d 87, 92 (1980) ("[W]hen the prosecution seeks a mistrial, it has the burden of showing a high degree of necessity[.]" (citation omitted)).

¶ 20        In turn, "[w]hether a grant of a mistrial is manifestly necessary is a question that turns on the facts presented to the trial court." *Schalow*, 251 N.C. App. at 347, 795 S.E.2d at 576 (citation and quotations omitted). Moreover:

> Since a declaration of a mistrial inevitably affects a constitutionally protected interest, the trial court must always temper the decision whether or not to abort the trial by considering the importance to the defendant of being able, once and for all, to conclude his confrontation with society through the verdict of a tribunal he might believe to be favorably disposed to his fate.

*Id.* (citation and quotation marks omitted). "As such, the trial court's discretion in determining whether manifest necessity exists is limited." *Id.* at 348, 795 S.E.2d at 576 (citations omitted).

¶ 21        "Our courts have set forth two types of manifest necessity: physical necessity and the necessity of doing justice." *Id.* (citation omitted). "For example, physical necessity occurs in situations where a juror suddenly takes ill in such a manner that wholly disqualifies him from proceeding with the trial." *Id.* (citation omitted). "Whereas the necessity of doing justice arises from the duty of the [trial] court to guard the administration of justice from fraudulent practices and includes the occurrence of some incident of a nature that would render *impossible* a fair and

impartial trial under the law." *Id.* at 348, 795 S.E.2d at 576-77 (emphasis added) (citation and quotation marks omitted); *see also Chriscoe*, 87 N.C. App. at 408, 360 S.E.2d at 814 (listing examples of manifest necessity under N.C. Gen. Stat. § 15A-1063(1), such as "some incapacity of either a member of the court, a juror or an attorney, or evidence of jury tampering" (citations omitted)).

¶ 22        Here, the first mistrial was not based on physical necessity; nor is there any allegation of fraudulent practices or misconduct by any party. Rather, the matter centers on whether manifest necessity justified a mistrial in Defendant's first trial over Defendant's objection where, during trial, the State belatedly uncovered evidence it claims was either corroborative of its case or potentially exculpatory to Defendant. The State contends manifest necessity existed to support the grant of mistrial based on the trial court's conclusion "it is in the public's interest in a fair trial to enter an order of mistrial . . . to allow time for the State Bureau of Investigation to test the items of clothing which were discovered in the prison's contraband locker." The State further argues the trial court's decision to grant the mistrial must be afforded great deference because Judge Grant carefully considered his decision. Indeed, Judge Grant's close and careful deliberation of this novel matter is abundantly clear on the Record.

¶ 23        However, the Supreme Court of the United States has indicated the amount of deference due to a trial court's mistrial decision operates on a spectrum. *See Arizona*

*v. Washington*, 434 U.S. 497, 510, 54 L. Ed. 2d 717, 731 (1978). "At one extreme are cases in which a prosecutor requests a mistrial in order to buttress weaknesses in his evidence." *Id.* at 507, 54 L. Ed. 2d at 729. "At the other extreme is the mistrial premised upon the trial judge's belief that the jury is unable to reach a verdict, long considered the classic basis for a proper mistrial." *Id.* at 509, 54 L. Ed. 2d at 730. At the latter extreme, "there are especially compelling reasons for allowing the trial judge to exercise broad discretion" in making a determination of manifest necessity and, thus, "[t]he trial judge's decision to declare a mistrial when he considers the jury deadlocked is therefore accorded great deference by a reviewing court." *Id.* at 509-10, 54 L. Ed. 2d at 730-31. However, at the former extreme, when "the basis for the mistrial is the unavailability of critical prosecution evidence," "the strictest scrutiny" applies to the question of manifest necessity. *Id.* at 508, 54 L. Ed. 2d at 730. Here, Defendant argues the State sought a mistrial for purposes of testing the newly discovered evidence in hopes it would corroborate witness testimony thereby buttressing its case against Defendant. However, two of Judge Grant's findings of fact that are unchallenged on appeal by Defendant state:

> 19. The prosecution further argues that if it is determined to be the defendant's blood[,] that fact would corroborate the prison inmate's testimony that the defendant wiped blood from his wound onto his clothing following the first altercation.

20. The prosecutor also argues that if the stains on the clothing are determined to be blood belonging to someone other than the defendant or the victim[,] it could be exculpatory to the defense.

¶ 24    "[A]s a general rule, the prosecutor is entitled to one, and only one, opportunity to require an accused to stand trial." *Id.* at 505, 54 L. Ed. 2d at 727-28. "Harassment of an accused by successive prosecutions or declaration of a mistrial so as to afford the prosecution a more favorable opportunity to convict are examples when jeopardy attaches." *Downum v. United States*, 372 U.S. 734, 736, 10 L. Ed. 2d 100, 102-03 (1963). Indeed, in discussing the application of the "manifest necessity" standard, the Supreme Court of North Carolina has recognized the State controls prosecutions:

> The State has dominant control of criminal cases. It has at its command law enforcement officers to fully investigate alleged offenses and report the results of the investigation. From the information obtained it decides what, if any, the criminal charge shall be. It determines when it is ready for trial and fixes the time for the trial to begin. It has full opportunity to confer with its witnesses before the trial commences.

*State v. Birckhead*, 256 N.C. 494, 507, 124 S.E.2d 838, 848 (1962). Thus, the Court asked and answered:

> If [the State's] preparation has been faulty, is it thereby entitled to more than one full opportunity to make preparation and gain a conviction, when there has been no fraud or interference on the part of defendant or from any other source? On the other hand, if the prosecuting witness is uncertain of the details of the occurrence until testimony is being given on the trial in the court of competent jurisdiction, does justice require such stringent action based on the belated revelation? We think not.

*Id.*

More recently, in *State v. Resendiz-Merlos*, our Court held there was no manifest necessity to grant a mistrial where the State elected to empanel the jury and proceed with trial without ascertaining whether its witnesses were present. 268 N.C. App. 109, 119, 834 S.E.2d 442, 449 (2019). Relying, in part, on *Downum*, this Court acknowledged in such a case, the State "takes a chance" in proceeding to trial. *Id.* We noted, "[u]nder these circumstances, [according to the *Downum* Court] . . . the State has 'entered upon the trial of the case without sufficient evidence to convict[,]' thereby assuming the risk of jeopardy attaching and barring a later prosecution." *Id.*

In this case, the newly found evidence was in the possession, custody, and sole control of the State, but the State had simply failed to uncover it. Neither party offers any suggestion of fraud or misconduct, nor do they offer a reasoned justification for its belated discovery other than faulty preparation. Indeed, Judge Grant was incredulous at the fact prison officials, law enforcement officials, and the prosecutor never specifically asked for nor delivered clothes from the incident when collecting the evidence. Following the reasoning of the decisions from the Supreme Court of the United States and the Supreme Court of North Carolina, and this Court, when the State undertook to try Defendant without ascertaining whether it had found or tested all the evidence in its possession, the State took a chance. Therefore, "[u]nder these circumstances . . . the State has entered upon the trial of the case . . . assuming the

risk of jeopardy attaching and barring a later prosecution." *Resendiz-Merlos*, 268 N.C. App. at 119, 834 S.E.2d at 449. Thus, the first mistrial was not justified by manifest necessity.

¶ 27 The State, however, argues and cites *Baum v. Rushton*, 572 F.3d 198 (4th Cir. 2009), as an instance where evidence discovered by the State mid-trial constituted a manifest necessity for a mistrial where the new evidence had the potential to either be exculpatory or inculpatory. It first bears mentioning the United States Court of Appeals for the Fourth Circuit's (Fourth Circuit) decision was in the context of a *habeas corpus* review as to whether the underlying grant of a mistrial by a South Carolina state court was contrary to, or an unreasonable application of, Supreme Court of the United States' precedent. *Id.* at 212. Moreover, the facts of *Baum*, and particularly the circumstances of the newly discovered evidence, are markedly different than in this case. In *Baum*, the defendant had been indicted on murder charges and the trial began without law enforcement finding the victim's body. *Id.* at 202. On the second day of the trial, the prosecution notified all parties that law enforcement had found the body in a neighboring state, and the state trial court— upheld by the state court of appeals—granted a mistrial to review the new evidence. *Id.* at 202-04. In the context of its review, the Fourth Circuit concluded "Although we might consider manifest necessity a closer call than the state court of appeals apparently did, we cannot say that its determination was objectively unreasonable."

*Id.* at 215. The Court based its conclusion on the state court's findings "the belated discovery of Pinion's body 'was in no way a result of any act, omission, negligence, bad faith, or lack of effort on the part of the State,' and that the potential evidentiary value of the body—not only as a source of exculpatory evidence for Baum, but also relevant evidence 'imperative' to a just judgment by the jury—was 'too great' to ignore." *Id.* (citation omitted).

However, *Baum* is inapposite here. First, the bloody clothes, merely alleged to be Defendant's and not worn during the alleged murder were offered purely as corroborative evidence, unlike the existence of a dead body which is almost literally direct evidence of the *corpus delicti*. Moreover, in *Baum*, the body was found in a different state and the prosecution had no idea where it was. Here, although the prosecution was apparently not aware of the bloody clothes, the State always had possession and control of the evidence and the ability to test it, but simply failed to even inquire from prison officials about the existence of such evidence.

Rather, we find the Fourth Circuit's decision in *United States v. Shafer,* 987 F.2d 1054 (4th Cir. 1993), to be instructive. In *Shafer*, the defendant was charged with arson and mail fraud after his manufacturing business burned down. *Id.* at 1055. At trial, the government, in an effort to establish a motive, called two witnesses to testify about circumstances suggesting the defendant was in financial distress. *Id.* at 1055-56. One week after the trial began, a state law enforcement officer brought

in a cart of financial records recovered from the burned-down business, which had never been turned over to investigators. *Id.* at 1056. The evidence had been in local law enforcement's possession for six years. *Id.* The records refuted the government's witnesses' claims, and the government stipulated the evidence was exculpatory to the defendant. *Id.*

¶ 30 The trial court ruled the government had failed to produce the evidence, after the defendant had requested all exculpatory evidence, and that failure was the government's fault because law enforcement should have known of its existence. *Id.* The defendant moved to dismiss the case; but, the trial court denied the dismissal, considered allowing a continuance for the defendant to inspect the evidence, and ultimately decided to declare a mistrial—over the defendant's objection—because the proceedings had been "tainted." *Id.*

¶ 31 On appeal, the Fourth Circuit held the mistrial violated the Double Jeopardy Clause because the trial court "ignored available alternatives" and because the "motivation for declaring the mistrial was partially to rescue" the government's case. *Id.* at 1059. The court explained, "the critical inquiry is whether less drastic alternatives were available." *Id.* at 1057 (citation omitted). Thus, the court reasoned, the trial court could have: ordered a brief continuance to study the material; inquired into the defendant's willingness to waive any prejudice suffered from the late disclosure and continue the trial; recalled the government's witnesses for additional

cross-examination; and allowed the defendant to use the evidence in his case-in-chief. *Id.* at 1058.

¶ 32        As to the "improper motives" for the mistrial, the court reasoned: "The Double Jeopardy Clause strictly forbids the district court from granting a mistrial to allow the prosecution to strengthen its case." *Id.* (citation and quotation marks omitted). The trial court had stated these discovery violations hurt the government's case. However, the Fourth Circuit held "this self-inflicted injury cannot be used to afford the government a second chance to prosecute so that it may argue a recast theory of the case better supported by the evidence." *Id.* at 1059. Moreover, as to the contention the mistrial was partially motivated by concerns of prejudice to the defendant, the court stated: "we must put aside" such statements and "note that such reservations were not shared by [the defendant], who wanted the trial to continue." *Id.* at 1058. Accordingly, the Fourth Circuit reversed the defendant's conviction. *Id.* at 1059.

¶ 33        Here, the trial court could have ordered a brief continuance to establish the admissibility of the evidence. The trial court could have also held a colloquy with Defendant to see if he was willing to waive any prejudice resulting from the evidence being excluded—as in *Shafer*, the Record is "replete with indications" Defendant was willing to do so. *Id.* at 1058. Further, the evidence the State wanted to test, and

possibly introduce at a later trial, was evidence the State bore the risk of not having at the time the State decided to move forward with the first trial.

In fact, the State had possession of the clothing, whether it knew it or not, the entire time. As in *Shafer*, it was the State's failure to discover, request, or collect potentially relevant evidence it had in its possession leading to the late discovery of the evidence. As such, the State could not obtain a mistrial to gain another opportunity to try Defendant. Moreover, even if the new evidence in this case was potentially exculpatory, we "must put aside" those concerns as they "were not shared by" Defendant. *Id.*

Thus, on the facts of this case, the State bore the risk of proceeding to trial and jeopardy attaching based on an incomplete investigation of the evidence in its possession and was not entitled to a second prosecution of Defendant in an effort to buttress its case. Therefore, there was no manifest necessity justifying the mistrial in the first trial. Consequently, jeopardy attached in the first trial and the State was barred from further prosecuting Defendant. Accordingly, the trial court in the second trial erred in denying Defendant's Motion to Dismiss on grounds of former jeopardy. *Odom*, 316 N.C. at 310, 341 S.E.2d at 334 (citation omitted).

## Conclusion

For the foregoing reasons, we vacate the Judgment entered against Defendant in 16 CRS 120 and reverse the trial court's denial of Defendant's Motion to Dismiss.

We remand this matter to the trial court with instructions to grant Defendant's

Motion to Dismiss in both 16 CRS 50352 and 120.

VACATED AND REMANDED FOR DISMISSAL.

Chief Judge STROUD and Judge TYSON concur.